UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID KEITH GERALD,                     Case No. 1:15-cv-493
      Petitioner,


                              Dlott, J.
     vs                                Bowman, M.J.


WARDEN, ROSS                            **REPORT AND**
CORRECTIONAL INSTITUTION,               **RECOMMENDATION**
      Respondent.


       Petitioner, an inmate in state custody, has filed a *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his conviction and sentence for multiple

offenses, including aggravated murder and aggravated arson, in Scioto County, Ohio, Court of

Common Pleas Case No. 12-CR-170. (Doc. 1). This matter is before the Court on the petition,

respondent's return of writ, petitioner's "traverse" in reply to the return of writ, and respondent's

sur-reply to petitioner's "traverse." (Docs. 1, 13, 16, 18).[1]

# I.  PROCEDURAL BACKGROUND

## State Trial Proceeding

       In March 2012, the Scioto County grand jury returned a ten-count indictment charging

petitioner with two counts of aggravated murder in violation of Ohio Rev. Code § 2903.01

(Counts 1 and 2); one count of murder in violation of Ohio Rev. Code § 2903.02(B) (Count 3);

one count of aggravated arson in violation of Ohio Rev. Code § 2909.02(A)(1) (Count 4); one

---

[1] Respondent has also separately filed the trial transcript and 23 exhibits obtained from the underlying
state-court record. (*See* Doc. 12).

count of arson in violation of Ohio Rev. Code § 2909.03(A)(1) (Count 5); three counts of

tampering with evidence in violation of Ohio Rev. Code § 2921.12(A)(1) (Counts 6-8); one

count of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(2) (Count 9); and one count of

conspiracy to commit aggravated murder/murder in violation of Ohio Rev. Code §

2923.01/2903.01(A)(1)/(A)(2)/2903.02(B) (Count 10).  (Doc. 12, Ex. 1).  The facts giving rise to

the charges were summarized in relevant part as follows by the Ohio Court of Appeals, Fourth

Appellate District, based on evidence presented at petitioner's trial:[2]

> [O]n March 7, 2012, Appellant, David Gerald, along with Thomas Steinhauer and
> Raymond "Jimmy" Linkous met Felipe Lopez at Lopez's house.  Lopez informed
> his wife, Kelly Lopez, that he was going with Appellant, Steinhauer and Linkous
> to a friend's house in Otway.  Instead of Otway, however, Lopez was found dead
> inside a pickup truck on Junior Furnace Powellsville Road, on the other side of
> the county, the same pickup truck he left his house in with Appellant, Steinhauer
> and Linkous.  The record . . . indicates that it was determined Lopez was stabbed
> with a knife, struck in the head with a hatchet, and burned alive inside the pickup
> truck.
>
> ****
>
> At trial, the State presented the following evidence.  On March 7, 2012, Lopez
> told his wife that he was going with Appellant, Steinhauer, and Linkous to Otway
> to meet a friend.  The four left in a red Chevy S-10 pickup truck.  Later that
> evening, witnesses observed a red or maroon Chevy S-10 pickup truck with one
> person inside and a white car, or silver PT Cruiser, with two people inside, parked
> along Junior Furnace Powellsville Road.  Shortly after 8:00 p.m., Jeff Huffman
> witnessed a vehicle being set on fire.  He testified that he saw something light,
> then heard an explosion.  As he approached, he testified that a PT Cruiser with
> one tail light out took off.  He testified he tried to approach the truck but that he
> could not get close as "stuff started popping."  Huffman returned to his house and
> called 911.  The Green Township Fire Department responded to the call.  Fire
> Chief, George Moore, testified that the fire originated inside the cab, was very
> intense and created a hazard to those around it.  Then, when emergency personnel

---

[2] The Ohio appellate court summarized the facts in its direct appeal decision issued August 21, 2014.  (*See* Doc. 12, Ex. 14).  28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless the petitioner rebuts the presumption by "clear and convincing evidence."  In the absence of clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted below, the appellate court's findings are presumed to be correct.  *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

arrived, they discovered a body inside the truck's passenger compartment, [which] was later determined to be Lopez.  Law enforcement officials learned that the pickup truck contained Lopez's body, and quickly suspected Raymond Linkous'[s] involvement due to prior experience with him driving the S-10 pickup truck that was burned, as well as the silver PT Cruiser.

When investigators arrived at Linkous'[s] residence, they found a silver PT Cruiser and verified that it did, indeed, have one tail light out.  They also observed a burn pile on the property.  They found Linkous exiting a trailer located in the rear of the property, in which Appellant resided.  Linkous appeared to have just showered, shaved his head, and also had nicks that were bleeding, as well as singed eyebrows and burn marks on his face and arms.  Linkous was then taken into custody and transported to the Sheriff's Department for questioning.  As a result of information gained from Linkous, investigators located Steinhauer, who handed investigators a bag of clothes and a knife upon their arrival.  Steinhauer then led investigators to an area in Kentucky where Lopez's cell phones and a hatchet were recovered.

When investigators spoke with Appellant, he blamed Steinhauer and Linkous for Lopez'[s] murder.  Appellant initially denied any knowledge of how the murder occurred, but then admitted to being present and witnessing Steinhauer stab Lopez and Linkous set fire to the truck.  He further admitted to being in the truck with the group while they drove from Lopez's residence, through Kentucky, back into Ohio, stopped at a gas station and then went to Junior Furnace Powellsville Road. Appellant denied participation in the murder, but admitted that the group had planned to meet at Lopez's house because Steinhauer owed him money for drugs. Appellant specifically denied any knowledge of a hatchet and denied hitting Lopez with a hatchet.

The State presented expert testimony at trial related to the DNA analysis that was performed on the evidence and the victim's cause of death.  Dr. Bryan Casto, the deputy coroner and forensic pathologist who performed the autopsy on Lopez testified that he identified multiple stab wounds, as if from a knife, and multiple chop wounds accompanied by crushing of the skull, as if from a hatchet.  He further testified that Lopez suffered inhalation thermal injuries.  Casto opined that the cause of death was multiple stab and chop wounds of the head and torso, contributed to by inhalation thermal injuries, which indicated Lopez was alive during the fire.

Additionally, Raymond Peoples, a BCI . . . [Bureau of Criminal Identification and Investigation] forensic scientist[,] testified regarding his performance of DNA analysis on both the knife and the hatchet.  He testified that the DNA profile from the swab of the knife blade was a mixture, with a major profile consistent with that of the victim.  He further testified that the DNA profile from the handle of the knife was a mixture of two individuals, the victim and Steinhauer.  With regard to the hatchet, Peoples testified that the DNA profile from the swab of the blade was

consistent with the victim, and that the handle included a mixture consistent with the victim, Appellant and Linkous. Thus, Appellant's DNA was present on the handle of the hatchet, despite Appellant['s] having denied knowledge of a hatchet.

Finally, the State presented the testimony of Steven Drummond, an individual who was in jail at the same time as Appellant. Drummond testified that he was bunkmates with Appellant at one point and that during the time they were in jail together, Appellant stated, with respect to his pending charges, that "[h]e hit him in the back of the head with a hatchet." He also testified that at one point, Appellant referred to the action, stating that his head split open like a watermelon. Drummond further testified that Appellant told him that he and the others went to Lopez's house in a borrowed vehicle with a hatchet and a knife in an effort to scare him so he would not try to collect the money they owed him for drugs. Drummond testified that Appellant told him that they disarmed Lopez and hit him in the back of the head.

(*Id.*, Ex. 14, pp. 3-9, at PAGEID#: 207-13) (footnote omitted).

It appears from the record that prior to trial, petitioner's counsel requested a bill of particulars, which was provided by the State, and filed a motion to preserve evidence, which was granted by the trial court. (*See id.*, pp. 4-5, at PAGEID#: 208-09 & Ex. 4). A few weeks before the trial was scheduled to commence, the prosecutor informed the court that the hatchet and knife recovered during the investigation were lost at some point after the items were tested and analyzed for DNA by BCI. (*See id.*, Ex. 14, pp. 5, 11, at PAGEID#: 209, 215). Petitioner's counsel then filed a motion requesting that the case be dismissed or, in the alternative, that the State be prohibited from introducing testimony regarding the hatchet and knife. (*Id.*, Ex. 5). The motion was denied. (*See id.*, Ex. 14, p. 5, at PAGEID#: 209). Finally, the State filed a motion in limine to prevent the defense from using Steven Drummond's arrest record for impeachment purposes, which was granted. (*See id.*, Ex. 6 & Trial Tr. 2-5, at PAGEID#: 462-65).

The matter then proceeded to trial before a jury, which found petitioner guilty as charged. (*Id.*, Ex. 8). On October 18, 2012, following a sentencing hearing, the trial court issued a Judgment Entry sentencing petitioner to an aggregate prison term of "Life without parole, plus

twenty-nine (29) years." (*Id.*, Ex. 9, at PAGEID#: 120). Specifically, the court sentenced petitioner to the following consecutive prison terms: "Life without Parole" for the aggravated-murder offense charged in Count 1; a 10-year prison term for the aggravated-arson offense charged in Count 4; 3-year prison terms for the tampering-with-evidence offenses charged in Counts 6, 7 and 8; and a 10-year prison term for the kidnapping offense charged in Count 9. (*See id.*, at PAGEID#: 118-20).[3]

### State Appeal Proceedings

Petitioner's trial counsel filed a timely notice of appeal to the Ohio Court of Appeals, Fourth Appellate District, on petitioner's behalf. (*See* Doc. 12, Ex. 10). Thereafter, with the assistance of new counsel for appeal purposes, petitioner filed an appellate brief containing the following list of assignments of error:

1. The Trial Court erred when it overruled Appellant's Motion to Dismiss and/or to prevent the State of Ohio from introducing evidence regarding the alleged murder weapon.

2. Appellant's convictions for (A) Aggravated Murder, (B) Felony Murder, (C) Murder, (D) Kidnapping, (E) Aggravated Arson, (F) Arson, and (G) Tampering with Evidence were against the manifest weight and sufficiency of the evidence.

3. The Trial Court's comments regarding the citizenship status of the Decedent, Felipe Lopez, were indicative of judicial bias and prejudicial to Appellant.

4. The Trial Court abused its discretion in admitting improper hearsay evidence from the statements of co-defendants Raymond Linkous and Thomas Steinhauer.

5. Appellant's Counsel was ineffective for failing to file a motion to suppress, failing to request independent testing of alleged DNA evidence, failing to request a curative instruction on hearsay, failing to object to improper opinion

---

[3] In the sentencing entry, the trial court also merged petitioner's other convictions by merging: (1) the aggravated-murder offense charged in Count 2, the murder offense charged in Count 3 and the conspiracy offense charged in Count 10 with the aggravated-murder offense charged in Count 1; and (2) the arson offense charged in Count 5 with the evidence-tampering offense involving the destruction of a "motor vehicle" charged in Count 8. (*See* Doc. 12, Ex. 9, at PAGEID#: 119-20).

testimony, failing to object to the Trial Court's improper instruction on the Decedent's immigration status, failing to object to the State of Ohio presenting an altogether different theory of events than what was disclosed in their Bill of Particulars, and fail[ing] to call any witnesses on behalf of the Appellant.

6. The Trial Court erred when it granted the State of Ohio's Motion in Limine which prevented the Appellant from appropriately cross examining witness Steven Drummond.

7. Appellant was denied due process of law and the right to a fair trial when the State of Ohio set forward a theory of prosecution at trial that was inconsistent with the Bill of Particulars previously filed.

8. Cumulative Errors committed during Appellant's trial deprived him of a fair trial and require a reversal of his convictions.

(*Id.*, Ex. 11, pp. 4-5, at PAGEID#: 135-36).

On August 21, 2014, the Ohio Court of Appeals issued a Decision and Judgment Entry overruling the assignments of error and affirming the trial court's judgment.  (*See id.*, Ex. 14).[4]

Petitioner's appellate counsel timely appealed on petitioner's behalf to the Ohio Supreme Court.  (*See id.*, Ex. 15).  In the memorandum in support of jurisdiction, the following claims were presented for the court's consideration:

1. The first and foremost issue is that Appellant submits to this Court that the Fourth District failed to consider this Court's standards regarding harmless error as promulgated in the matter of *State v. Ricks*, 136 Ohio St.3d 356 (2013), [which] is closely analogous to the details contained in Appellant's fourth assignment of error.

2. The second issue in this case that Appellant submits to this Court constitutes grounds for appeal is that Appellant was deprived of his Due Process Rights under the Ohio and United States Constitutions when the Trial court overruled his Motion to Dismiss and/or to Prevent the State of Ohio from introducing evidence regarding the alleged murder weapons.

---

[4] It is noted that one of the judges on the three-judge panel filed a concurring opinion to express his reasons for finding no merit to petitioner's first and fourth assignments of error.  (*See* Doc. 12, Ex. 14, pp. 77-81, at PAGEID#: 281-85).  Another judge issued a dissenting opinion, disagreeing with the majority decision to overrule petitioner's fourth assignment of error, eighth assignment of error and the portion of petitioner's fifth assignment of error alleging ineffectiveness by petitioner's trial counsel in failing to file a suppression motion.  (*See id.*, pp. 82-92, at PAGEID#: 286-96).

    3.    Appellant further submits that numerous other issues exist which constitute grounds for this Court to hear his appeal.  These issues include (a) improper comments made by the trial judge, (b) issues regarding manifest weight and sufficiency of the evidence against him, (c) ineffective assistance of counsel, (d) being prevented from fully cross-examining the State's witnesses against him, and (e) cumulative error.  It should be noted that the dissenting opinion found that Appellant's trial attorney was ineffective for failing to file a motion to suppress, and further opined that the cumulative error doctrine prevented Appellant from receiving a fair trial.  Appellant submits that said dissent demonstrates that there is substantial merit to his aforementioned claims, and provides this Court with substantial reason to hear this appeal.

(*Id.*, Ex. 16, pp. 9, 12, 14-15, at PAGEID#: 309, 312, 314-15).

On February 18, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal.  (*Id.*, Ex. 18).

### Application To Reopen Appeal

On November 13, 2014, while his appeal was pending before the Ohio Supreme Court, petitioner filed a timely *pro se* application with the Ohio Court of Appeals, Fourth Appellate District, requesting that the direct appeal be reopened.  (Doc. 12, Ex. 19).  In the application filed pursuant to Ohio R. App. P. 26(B), petitioner contended that his appellate counsel was ineffective for failing to present an ineffective-assistance-of-trial-counsel claim based on counsel's failure to present a defense regarding "the chain of custody of evidence," which petitioner claimed "was tainted by the Lead Investigator[,] Detective Jodi Conkel."  (*See id.*, at PAGEID#: 414-15).

On December 16, 2014, the Ohio Court of Appeals denied petitioner's application to reopen the appeal after addressing the merits of petitioner's ineffective-assistance-of-appellate-counsel claim and finding "no genuine issue concerning counsel's effectiveness."  (*Id.*, Ex. 20).  Apparently, petitioner did not pursue an appeal to the Ohio Supreme Court in that matter.  (*See* Doc. 13, p. 9, at PAGEID#: 938).

7

**Federal Habeas Corpus Petition**

In July 2015, petitioner commenced the instant federal habeas corpus action.  (*See* Doc.

1).  In his petition, petitioner presents ten grounds for relief:

**Ground One:**  The Fourth District failed to consider the State's standards regarding harmless error review once constitutional error was found to exist.

**Ground Two:**  The Trial Court erred when it overruled Appellant[']s Motion to Dismiss and/or to prevent the State of Ohio from introducing evidence regarding the alleged murder weapons.

**Ground Three:**  Appellant's convictions for (A) Agg. Murder[,] (B) Felony Murder, (C) Murder, (D) Kidnapping, (E) Agg. Arson, (F) Arson, and (G) Tampering with Evidence were against the manifest weight and sufficiency of the evidence.

**Ground Four:**  Trial Court's comments regarding the citizenship status of the Decedent, Felipe Lopez, were indicative of judicial bias and prejudicial to the Appellant.

**Ground Five:**  The Trial Court abused its discretion in admitting improper hearsay evidence from the statements of co-defend[a]nts Raymond Linkous and Thomas Steinh[aue]r.

**Ground Six:**  Appellant[']s counsel was ineffective for failing to file a motion to suppress, failing to request independent testing of alleged DNA evidence, failing to request a curative instruction on hearsay, failing to object to improper opinion testimony, failing to object to the Tr[ia]l Court's improper instruction on the Decedent's immigration status, failing to object to the State of Ohio presenting an altogether different theory of events than what was disclosed in their Bill of Particulars and fail[ing] to call any witnesses on behalf of the Appellant.

**Ground Seven:**  The Trial Court erred when it granted the State of Ohio's Motion in Limine which prevented the Appellant from appropriately cross-examining witness Steven Drummond.

**Ground Eight:**  Appellant was denied due process of law and the right to a fair trial when the State of Ohio set forward a theory of prosecution at trial that was inconsistent with the Bill of Particulars previously filed.

**Ground Nine:**  (A) Appellant's direct appeal counsel failed to present review of the Chain of Custody of evidence by Det. Conkel.  (B) Appellant's direct appeal counsel failed to address Appellant's conviction for conspiracy to commit Agg. Murder or Murder of which being against the manifest weight and sufficiency of

the evidence.

> **Ground Ten:** Cumulative Errors committed during Appellant's trial deprived him of a fair trial and require a reversal of his convictions.

(*Id.*, at PAGEID#: 7-15).

Respondent has filed a return of writ in response to the petition. (Doc. 13). Petitioner has filed a "traverse" in reply to the return of writ, and respondent was permitted to file a "sur-reply" in response to petitioner's "traverse." (Docs. 16, 18).

## II.  OPINION

### A.  Petitioner Procedurally Defaulted And Has Waived The Claims Alleged In Grounds Eight And Nine Of The Petition

In Ground Eight of the petition, petitioner claims he was denied a fair trial when the prosecution presented a theory of guilt that was inconsistent with the bill of particulars provided to the defense during pretrial discovery. (Doc. 1, at PAGEID#: 13). In Ground Nine, petitioner contends his appellate counsel was ineffective for failing to assert as assignments of error that (1) petitioner's trial counsel was ineffective for not challenging the "Chain of Custody of evidence by Det. Conkel," and (2) petitioner's conviction for conspiracy to commit aggravated murder or murder was against the manifest weight of the evidence and not supported by sufficient evidence. (*Id.*, at PAGEID#: 14). Respondent has argued in the return of writ that both grounds for relief are barred from review because they were procedurally defaulted in the state courts. (*See* Doc. 13, pp. 42-45, at PAGEID#: 971-74). Respondent's argument has merit.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard*

9

*v. Connor,* 404 U.S. 270, 275-76 (1971).  In order to satisfy the fair presentation requirement, the claims asserted in the federal habeas petition must be based on the same facts and same legal theories that were presented to the state courts.  *Carter v. Mitchell*, 693 F.3d 555, 568 (6th Cir. 2012) (citing *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998)).  Moreover, a claim is deemed fairly presented only if the petitioner presented his constitutional claims for relief to the state's highest court for consideration.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir. 1985).

If a petitioner fails to fairly present his constitutional claims through the requisite levels of state appellate review to the state's highest court, or commits some other procedural default that prevents a merit-based review of the federal claims by the state's highest court, he may have waived the claims for purposes of federal habeas review.  *See O'Sullivan,* 526 U.S. at 847-48; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).  If, because of a procedural default, the petitioner has not had his claims considered by the state's highest court and he can no longer present his claims to the state courts, the claims are barred from review unless the petitioner can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors or that failure to consider the claims will result in a "fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, petitioner defaulted the fair-trial claim alleged in Ground Eight because although he presented it as an assignment of error on direct appeal to the Ohio Court of Appeals

10

(*see* Doc. 12, Ex. 11, at PAGEID#: 160), he failed to raise it as an issue for consideration on further appeal to the Ohio Supreme Court.  (*See id.*, Ex. 16).  With respect to the ineffective-assistance-of-appellate-counsel claims alleged in Ground Nine, although petitioner filed a timely application for reopening of his direct appeal in order to raise claims attacking his appellate counsel's performance, he never presented to the state courts any claim based on counsel's failure to challenge the weight and sufficiency of evidence supporting his conspiracy conviction. Moreover, although petitioner did contend in his reopening application that his appellate counsel was ineffective for failing to assert the ineffective-assistance-of-trial-counsel claim pertaining to the chain of custody of evidence, petitioner never pursued an appeal to the Ohio Supreme Court from the Ohio Court of Appeals' December 16, 2014 decision denying petitioner's request to reopen the appeal.  At this late juncture, review by the state's highest court of any ineffective-assistance-of-appellate-counsel claim that was presented to the Ohio Court of Appeals in the reopening proceeding is foreclosed under Ohio S.Ct.Prac.R. 7.01(A)(4)(c), which provides that the "provision for delayed appeal [applicable to felony cases] does not apply to appeals involving postconviction relief or appeals brought pursuant to App.R. 26(B)."

Because petitioner did not present the claim alleged in Ground Eight to the Ohio Supreme Court in the direct-review proceedings and failed to pursue an appeal to the Ohio Supreme Court from the denial of his reopening application, the state's highest court did not have the opportunity to consider any of the issues presented in Grounds Eight and Nine of the instant petition.  Therefore, both grounds for relief are procedurally defaulted and barred from review by this Court unless petitioner "can demonstrate cause for the default[s] and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *See Coleman*, 501 U.S. at 750.

Petitioner has neither argued nor otherwise established cause for his procedural defaults in this case.  In addition, he has not demonstrated that failure to consider the defaulted claims will result in a "fundamental miscarriage of justice," or in other words, that the alleged errors "probably resulted in the conviction of one who is actually innocent."  *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995).  No such showing has been made to the extent that petitioner has challenged the sufficiency of the evidence introduced at trial to establish his guilt, because actual innocence means factual innocence, not mere legal insufficiency.  *See House v. Bell,* 547 U.S. 518, 538 (2006); *Carter v. Mitchell,* 443 F.3d 517, 538 (6th Cir. 2006) (citing *Bousley v. United States,* 523 U.S. 614, 623 (1998)); *Wright v. Lazaroff*, 643 F. Supp.2d 971, 989 (S.D. Ohio 2009) (Barrett, J.; Hogan, M.J.); *see also Vanwinkle v. United States,* 645 F.3d 365, 369 (6th Cir. 2011).

Accordingly, the undersigned concludes that petitioner procedurally defaulted and has waived the claims alleged in Grounds Eight and Nine of the petition.  The two grounds for relief, which are barred from review by this Court, are subject to dismissal with prejudice.

**B.  Petitioner Is Not Entitled To Habeas Relief Based On His Claim In Ground Two Challenging The Trial Court's Rulings Pertaining To Evidence That Was Lost While In The State's Possession**

In Ground Two of the petition, petitioner alleges that the trial court committed error of constitutional dimension when it denied his motion to dismiss the indictment and/or prevent the admission of evidence pertaining to the alleged murder weapons, which were lost at some point after the items were subjected to DNA testing by BCI.  (*See* Doc. 1, at PAGEID#: 8).  The claim, which was presented to both the Ohio Court of Appeals and Ohio Supreme Court for consideration, is subject to review on the merits.

It appears from the record that the trial court opted to rule on petitioner's motion during

the trial following the State's presentation of its case-in-chief. (*See* Doc. 12, Trial Tr. 482, at

PAGEID#: 854). The trial court summarily overruled the motion after finding no "bad faith" and

that the loss of the alleged murder weapons was the result of "human error" only. (*Id.*, Trial Tr.

483, at PAGEID#: 855).

Petitioner challenged the trial court's ruling on direct appeal. The Ohio Court of

Appeals, which was the last state court to issue a reasoned decision addressing petitioner's claim,

overruled the assignment of error, reasoning in relevant part as follows:

> In his first assignment of error, Appellant contends that the trial court erred when
> it overruled his motion to dismiss and/or prevent the State from introducing
> evidence regarding the alleged murder weapons. Appellant argues that the State,
> in losing the knife and hatchet, failed to preserve evidence in accordance with the
> trial court's order filed on April 5, 2012, and, as a result, he was deprived of due
> process. He further argues that he was prevented from seeking independent DNA
> testing of the alleged murder weapons, a hatchet and a knife, because the State
> consumed the entire DNA sample prior to losing the weapons. The State
> responds by contending that Appellant has not demonstrated bad faith on the part
> of the State with respect to the loss of the evidence, and, as such, has not suffered
> a deprivation of due process.
>
> Appellant cites R.C. 2933.82 "Securing biological evidence" in support of his
> contention that the State had an obligation to preserve the DNA evidence on the
> murder weapons that were in the State's possession. There is no argument on
> appeal that the State had such an obligation. Further, Appellant points out that he
> filed a motion to preserve evidence on April 4, 2012, which motion was granted
> by the trial court on April 5, 2012. Again, the fact that the State was under a
> statutory obligation, as well as a court ordered duty to preserve the biological
> evidence at issue herein is not in dispute. The record reveals, however, that a
> knife and a hatchet, both alleged murder weapons, were lost after DNA testing
> was performed by BCI. Thus, based upon the following, the question at issue
> herein is whether Appellant has demonstrated bad faith on the part of the State in
> failing to preserve this evidence, which must be demonstrated in order to prove a
> deprivation of due process.
>
> ****
>
> The Due Process Clause of the Fourteenth Amendment to the United States
> Constitution provides that no State shall "deprive any person of life, liberty, or
> property, without due process of law[.]" To determine if a defendant's alleged
> due process rights are violated, courts characterize lost or destroyed evidence as

(1) "materially exculpatory" or (2) "potentially useful." See, *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1. "The Due Process Clause protects a defendant from being convicted of a crime where the state has failed to preserve materially exculpatory evidence or has destroyed, in bad faith, potentially useful evidence." . . .

Here, Appellant has conceded that the evidence in issue is not materially exculpatory. In his motion to dismiss that was filed on October 2, 2012, Appellant stated that the question of whether the lost evidence was materially exculpatory was not at issue. Appellant instead argued that the evidence at issue was potentially useful and that the State had acted in bad faith by losing it in violation of a court order requiring it [to] preserve the evidence. However, "[u]nless a defendant can show that the state acted in bad faith, the state's failure to preserve potentially useful evidence does not violate a defendant's due process rights." *Geeslin*, supra, syllabus, following *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

Appellant has equated the State's loss of the knife and hatchet to bad faith, essentially arguing that it amounted to bad faith, per se, to lose the evidence when there was an order to preserve evidence. We reject this argument and instead find that the State's actions in losing the evidence did not rise to the level of bad faith, which has been defined as follows:

> "The term 'bad faith' generally implies something more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or [ill] will partaking of the nature of fraud. It also embraces the actual intent to mislead or deceive another."...

Aside from [the] contention that the mere act of losing the evidence constitutes bad faith, Appellant has failed to demonstrate bad faith on the part of the State. In fact, the record reveals that this loss of evidence was simply accidental, and there is nothing in the record to suggest otherwise. For instance, Paul Blaine, the officer in charge of the Sheriff's evidence room, testified that in twelve years he had never lost a piece of evidence.

Appellant further argues that he was deprived of due process because he was unable to obtain independent testing of the DNA evidence on the alleged murder weapons due to the State's consumption of the DNA sample during its testing, which was conducted prior to the loss of the weapons. However, as pointed out by the State:

> "The consumptive testing of evidence violates a defendant's due process rights only when the evidence possesses an exculpatory value that was apparent before the evidence was destroyed." *State v. Rios*, 2nd Dist. Clark No. 10CA0099, 2012-Ohio-3289, *3;

14

citing *California v. Trombetta,* 467 U.S. 479, 488-489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

Further, as reasoned by the Eighth District Court of Appeals in *State v. Abercrombie*, 8th Dist. Cuyahoga No. 88625, 2007-Ohio-5071, ¶ 23:

> "Unless a criminal defendant can show bad faith, the State's failure to preserve potentially useful evidence—of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant—does not constitute a violation of the due process clause of the United States Constitution's Fourteenth Amendment. *Arizona v. Youngblood* (1988), 488 U.S. 51."

Here, we have already determined that Appellant has not demonstrated bad faith on the part of the State and that the State's accidental loss of evidence, despite the existence of a court order requiring it to preserve the evidence at issue, does not rise to the level of bad faith. With respect to the consumptive testing of the DNA evidence that was collected prior to the loss of the knife and hatchet, the State's forensic scientist, Raymond Peoples, testified that the DNA evidence collected from the knife handle and hatchet handle was consumed during testing. Mr. Peoples testified at trial as follows:

> "Q. *** And then there are some listed at the end of your report under remarks, that say they were consumed during analysis. What does that mean?
>
> A. There are some samples – usually when there is a body fluid, and a good amount of it, such as blood, a lot of times we don't need to consume the sample to do our testing, but there are times where in the process of testing we need to consume, whether it cutting – using the whole outer layer or the swab. So we list in our report as consumed during analysis.
>
> Q. Okay. So if that's consumed we would not get an envelope back, is that correct?
>
> A. No, you would not."

The trial transcript further reflects that the samples taken from the knife and hatchet handles were consumed during analysis. However, there is nothing in the record to indicate any bad faith on the part of the State with respect to the consumptive testing, but rather that consumption of the sample is sometimes required during testing.

Finally, Appellant cannot demonstrate that the evidence at issue possessed any

exculpatory value prior to its loss.  As discussed above, Appellant has not argued that the evidence was materially exculpatory, but rather, that it was potentially useful.  Additionally, if anything, the evidence was inculpatory, as the testing performed by the State indicated the presence of the Appellant's DNA on the hatchet, when Appellant claimed that he did not touch the hatchet.

Based on the foregoing, we find no merit to Appellant's first assignment of error….

(*Id.*, Ex. 14, pp. 10-17, at PAGEID#: 214-21) (some Ohio case citations omitted).[5]

This Court's review of petitioner's claim of constitutional error is limited.  Under §

2254(d), a writ of habeas corpus may not issue with respect to any claim adjudicated on the

merits by the state courts unless the adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives

at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts."  *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v.*

*Taylor,* 529 U.S. 362, 412-13 (2000)).  "A state court's adjudication only results in an

'unreasonable application' of clearly established federal law when 'the state court identifies the

correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies

that principle to the facts of the prisoner's case.'"  *Id.* at 599-600 (quoting *Williams,* 529 U.S. at

413).

_____

[5] One of the judges on the three-judge appellate court panel issued a separate opinion concurring in the majority's judgment that the assignment of error was meritless.  The judge, however, would have applied a different "hybrid standard of review" in reaching that decision.  (*See* Doc. 12, Ex. 14, p. 77, at PAGEID#: 281).

The statutory standard, established when the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600.

As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* [563] U.S. [170], 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* [562] U.S. [86, 98-99], 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original). The Supreme Court has further held that when a state court rules

against a defendant in an opinion that "addresses some issues but does not expressly address the

federal claim in question," the federal habeas court must presume, subject to rebuttal, that the

federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of

review" set out in § 2254(d). *See Johnson v. Williams*, __ U.S. __, 133 S.Ct. 1088, 1091 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete

bar on federal-court relitigation of claims already rejected in state proceedings" and "preserves

authority to issue the writ in cases where there is no possibility fairminded jurists could disagree

that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 562 U.S.

at 102. In other words, to obtain federal habeas relief under that provision, the state prisoner

must show that the state court ruling on the claim presented "was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id.* at 103.

17

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, 565 U.S. 34, 39-40 (2011); *cf. Otte,* 654 F.3d at 600 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision").  The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412); *see also White v. Woodall*, __ U.S. __, 134 S.Ct. 1697, 1702 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012) (internal citation and quotation marks omitted)) ("'[C]learly established Federal law' for purposes of § 2254(d)(1) includes 'only the holdings, as opposed to the dicta, of this Court's decisions.'").  Decisions by lower courts are relevant only "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

In this case, the Ohio Court of Appeals correctly identified and applied the applicable standards of review established by the Supreme Court in assessing the merits of due process claims arising from the loss or destruction of evidence by the State.  As the state court apparently understood, it is well-established under Supreme Court precedents that a defendant's due process rights are violated when the State either fails to preserve material exculpatory evidence or, in bad faith, fails to preserve potentially useful evidence.  *See Arizona v. Youngblood,* 488 U.S. 51

(1988); *California v. Trombetta,* 467 U.S. 485 (1984); *see also Hall v. Moore,* No. 1:02cv34, 2008 WL 565788, at *3, *27 (S.D. Ohio Feb. 29, 2008) (Spiegel, J.; Black, M.J.), *aff'd,* 339 F. App'x 576 (6th Cir. 2009).

In *Trombetta,* the Court held that due process is violated, regardless of whether or not the government acted in bad faith, when the government fails to preserve material exculpatory evidence within the meaning of *Brady v. Maryland,* 373 U.S. 83 (1963).  *Trombetta,* 467 U.S. at 488-89; *see also Youngblood,* 488 U.S. at 57; *United States v. Wright,* 260 F.3d 568, 570-71 (6th Cir. 2001).  To establish a due process violation under *Trombetta*, it must be shown that the non-preserved evidence "both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Trombetta,* 467 U.S. at 489; *see also Wright,* 260 F.3d at 570-71.

In *Youngblood*, 488 U.S. at 57, the Court held that "the Due Process Clause requires a different result when [dealing] with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  In such a case, involving the failure "to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to the defendant," *United States v. Jobson,* 102 F.3d 214, 218 (6th Cir. 1996), the defendant must demonstrate that the State acted in bad faith in failing to preserve the evidence in addition to showing that the evidence both possessed an exculpatory value that was apparent before its destruction and was of such a nature that the defendant would not be able to obtain comparable evidence by other reasonably available means.  *Youngblood,* 488 U.S. at 57.  Negligence or even gross negligence in failing to preserve potentially useful evidence does not satisfy the "bad faith"

19

requirement. *Wright*, 260 F.3d at 571 (citing *Jobson*, 102 F.3d at 218); *see also United States v. Darji*, 609 F. App'x 320, 326 (6th Cir. 2015). "In order to establish bad faith, 'a defendant must prove official animus or a conscious effort to suppress exculpatory evidence.'" *United States v. Collins*, 799 F.3d 554, 569 (6th Cir.) (quoting *Jobson*, 102 F.3d at 218), *cert. denied*, 136 S.Ct. 601 (2015).

Here, upon review of the record, the undersigned concludes that it was reasonable for the state appellate court to determine under the well-established standards set forth in *Trombetta* and *Youngblood* that petitioner had not shown he was deprived of a fair trial by the loss of the alleged murder weapons following BCI's DNA testing and analysis of those items.

First, as the Ohio Court of Appeals reasonably found, petitioner has not demonstrated that the lost evidence was materially exculpatory within the meaning of *Brady*. Indeed, as the court pointed out, the evidence was inculpatory to the extent that DNA testing of the weapons revealed the presence of petitioner's DNA on the handle of the hatchet allegedly used to chop the victim's head. Moreover, although the evidence possessed an exculpatory value to the extent that DNA testing showed that only co-defendant Steinhauer's DNA was on the handle of the knife used to stab the victim and that co-defendant Linkous's DNA was also on the handle of the hatchet, those test results constituted available "comparable evidence," which was introduced at trial for the jury's consideration. To the extent petitioner suggests that the knife and hatchet might have held an additional exculpatory value, the question involves a failure "to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to the defendant," *Jobson,* 102 F.3d at 218, which requires a showing that the State acted in bad faith.

In addressing the issue of bad faith, the Ohio Court of Appeals concluded that because petitioner was required to show more than negligence on the part of the State, the violation of a

court order to preserve evidence, standing alone, was insufficient to satisfy the bad-faith requirement.  The court further found that the record reflected that the State had not acted in bad faith, but rather that the loss of the murder weapons was merely "accidental."   Upon review of the record, the undersigned concludes that it was reasonable for the state court to reject petitioner's due process claim for those reasons.

The undersigned agrees that a violation of a court order or statutory requirements pertaining to the preservation of evidence does not rise to the level of bad faith absent a showing that the violation was intentional and not the result of error amounting to negligence or even gross negligence.  *Cf. Collins*, 799 F.3d at 569; *Wright*, 260 F.3d at 571; *Jobson*, 102 F.3d at 218; *see also Darji*, 609 F. App'x at 326.  Moreover, there is no evidence in the record even remotely indicating that the murder weapons possessed an "apparent" exculpatory value in addition to the already available information obtained from the DNA testing conducted by BCI. As the Ohio Court of Appeals reasonably found, the evidence elicited at trial suggests that in this case involving three accomplices who were separately prosecuted, the loss of the items, which were transferred between BCI, the Scioto County Sheriff's Office and the Fire Marshal's Office during the course of the investigation, was merely "accidental."  At most, the evidence indicates that the items were lost as the result of negligent error on the part of those responsible for keeping track of the evidence during the process of transfer between departments, but certainly not the result of any official animus toward petitioner or an intentional, conscious decision by law enforcement to suppress exculpatory evidence.  (*See* Doc. 12, Trial Tr. 310-12, 340-47, 372-74, at PAGEID#: 676-78, 706-13, 738-40).

Accordingly, in sum, petitioner has not demonstrated that he is entitled to habeas relief based on the due-process claim alleged in Ground Two of the petition.  Petitioner has not shown

that "fairminded jurists could disagree" that the Ohio Court of Appeals' adjudication of the

constitutional issues is contrary to *Trombetta/Youngblood* or "was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *See Harrington*, 562 U.S. at 102-03.  Therefore, Ground Two of the

petition should be denied with prejudice.

### C.  Petitioner Is Not Entitled To Relief Based On The Judicial-Bias Claim Alleged in Ground Four Of The Petition

In Ground Four of the petition, petitioner alleges that the trial court made comments

during trial, which were "indicative of judicial bias" and prejudiced the defense.  (Doc. 1, at

PAGEID#: 10).

In the return of writ, respondent contends that petitioner has failed to state a claim of

constitutional dimension and, in any event, has waived such a claim because he did not present

the constitutional issue to the state courts.  (*See* Doc. 13, pp. 27-28, at PAGEID#: 956-57).  The

undersigned disagrees.  A claim of judicial bias implicates concerns that the defendant may have

been denied his due-process right to a fair trial before a fair tribunal.  *See Bracy v. Gramley,* 520

U.S. 899, 904-05 (1997); *Withrow v. Larkin*, 421 U.S. 35, 46 (1975); *In re Murchison*, 349 U.S.

133, 136 (1955).  In arguing the issue on direct appeal, petitioner explicitly contended that the

trial judge's challenged conduct was "prejudicial to [his] right to a fair trial."  (*See* Doc. 12, Ex.

11, p. 21, at PAGEID#: 152).  The underlying fair-trial issue was also recognized and discussed

in state-court decisions that were cited and relied on by petitioner in his appellate briefs.  *See*

*State v. Wade*, 373 N.E.2d 1244, 1248-49 (Ohio), *vacated on other grounds*, 438 U.S. 911

(1978); *State v. McCarley*, No. 22562, 2006 WL 625968, at *2 (Ohio Ct. App. Mar. 15, 2006).[6]

Indeed, in its decision discussed below, the Ohio Court of Appeals implicitly addressed the fair-

---

[6] *Wade* was cited in petitioner's initial state appellate brief, and *McCarley* was cited in petitioner's brief in reply to the State's responsive pleading.  (*See* Doc. 12, Exs. 11, 13).

trial issue. Therefore, although petitioner only generally referred to "improper comments by the trial judge" in his memorandum in support of jurisdiction on further appeal to the Ohio Supreme Court (*see* Doc. 12, Ex. 16), the undersigned finds that the constitutional issue was sufficiently presented to the state courts to warrant this Court's merit-based review.

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing petitioner's claim of judicial bias. The court rejected the assignment of error, reasoning in relevant part as follows:

> In his third assignment of error, Appellant contends that the trial court's comments regarding the citizenship status of the victim . . . were indicative of judicial bias. Appellant contends that a statement made, or rather curative instruction given, by the trial court to the jury was prejudicial. The State responds by acknowledging the statement made by the trial court, but contends that it did not rise to the level of judicial bias, and did not prejudice Appellant, especially in light of a further curative instruction given to the jury prior to deliberations.

> A review of the record indicates that Appellant's counsel attempted to cross-examine Detective Conkel regarding the citizenship status of the victim, Felipe Lopez. When counsel inquired as to the expiration of the victim's work visa, an objection was made and a bench conference was held. After discussion with counsel, the trial court stated, outside the presence of the jury, that "his citizenship status does not matter. It is no relevance to this case." The objection was then sustained and the court stated as follows to the jury: "I'm going to instruct the jury at this time that citizenship status has no bearing on this case. I don't know whether he's a citizen or not, but everybody has a right to live. Okay." Appellant argues that this statement was not only prejudicial, but was an incorrect statement of the law, as Ohio law recognizes the doctrine of self-defense and defense of others. Appellant further argues that comments made by the trial court at Appellant's eventual sentencing hearing indicating that this was the "most heinous crime" it had seen were prejudicial and indicative of bias.

> As this Court recently observed:

>> "Judicial bias has been described as 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.'. . .

>> In *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127

L.Ed.2d 474 (1994), the Supreme Court held that 'opinions formed by the judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'  On the other hand, '[t]hey may do so [support a bias challenge] if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' (Emphasis sic.) *Id*."  *Culp v. Olukoga*, 3 N.E.3d 724, 2013-Ohio-5211, ¶ 55. . . .

Further, as we noted in *Culp* at ¶ 55:

"A trial judge is presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity. . . .  Bias against a party is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party. . . ."

Here, a review of the trial transcript does not indicate that the trial judge displayed any "deep-seated favoritism or antagonism that would make fair judgment impossible."  Although the trial court judge may have gone, as Appellant says, a step too far, in making the statement that everyone deserves to live, we cannot find that this remark supports a bias or partiality challenge.  Further, we reject Appellant's suggestion that such a statement is contrary to a claim of self-defense or defense of others.  Additionally, as pointed out by the State, the trial court provided a limiting instruction to the jury prior to deliberations as follows:

"If, during the course of the trial, I said or did anything which you consider an indication of my view on the facts, you are instructed to disregard it.  The Judge must be, and sincerely desires to be, impartial in presiding over this and every other trial before a jury and without a jury.  The Court does not have the right and does not desire to invade the province of the jury by indicating in any way a preference between the State and the Defendant and the Court has not done so at any time."

Courts have long held that juries are presumed to follow limiting, or curative, instructions. . . .

Further, we find no merit to Appellant's argument that the trial court's statements at sentencing were prejudicial.  A review of the record indicates that this

statement made by the trial court was made after the jury had already rendered its decision. Thus, it could not have influenced the jury. R.C. 2929.11(A) requires that the trial court, in imposing sentence, be guided by the overriding principles and purposes of felony sentencing, which include the need to protect the public from future crime by the offender, and also to punish the offender. Further, R.C. 2929.12 requires the trial court to consider certain factors in imposing sentences for felony offenses. These factors include the seriousness of the offender's conduct, the danger posed to the public, and the degree of harm caused. We find that the statement by the trial court with respect to the seriousness of the offense was consistent with the court's duties under the felony sentencing statutes and in no way reflects judicial bias.

(Doc. 12, Ex. 14, pp. 33-38, at PAGEID#: 237-42) (some Ohio case citations omitted).

The Ohio Court of Appeals' decision is neither contrary to nor involves an unreasonable application of Supreme Court precedents that provide guidance in resolving the due-process issue raised in the case-at-hand.

It has long been well-settled that the Fourteenth Amendment's Due Process Clause "requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of a particular case." *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013) (quoting *Bracy*, 520 U.S. at 904-05; citing *Tumey v. Ohio*, 273 U.S. 510, 535 (1927)). As the Ohio Court of Appeals apparently understood, this case falls into the category of cases exemplified by *Liteky*, 510 U.S. at 555-56, which are "more appropriately described as . . . 'judicial misconduct' cases" to the extent that "the trial judge is accused of conducting proceedings in a manner that strongly suggests to the jury that the judge disbelieves the defendant's case, or for other reasons, thinks the prosecution should prevail." *See Allen v. Hawley*, 74 F. App'x 457, 460 (6th Cir. 2003). Although the Court in *Liteky* addressed statutory standards for the recusal of federal judges, the Sixth Circuit has relied on that decision as providing guidance in assessing claims of judicial bias under the Due Process Clause. *See Smith v. Warden, Southern Ohio Corr. Facility*, No. 1:07cv977, 2009 WL 4281095, at *1, *32 (S.D.

Ohio Nov. 24, 2009) (Dlott, J.; Black, M.J.) (citing *Lyell v. Renico*, 470 F.3d 1177, 1186 (6th Cir. 2006), in turn citing *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002)), *aff'd*, 453 F. App'x 625 (6th Cir. 2011).

Under *Liteky*, 510 U.S. at 551, a judge's "favorable or unfavorable predisposition" may be characterized as "bias" or "prejudice" if "it is so extreme as to display clear inability to render fair judgment." *See also Lyell*, 470 F.3d at 1186. As the Ohio Court of Appeals pointed out in this case, the *Liteky* Court emphasized that "judicial rulings almost never constitute a basis for a bias or partiality motion . . . and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved." *Liteky*, 510 U.S. at 555. The *Liteky* Court further opined that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of . . . proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* The Court continued:

> Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.* at 28. . . . *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as . . . judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555-56 (emphasis in original).

In this case, the undersigned agrees with the Ohio Court of Appeals' determination that

26

the trial judge's challenged conduct falls far short of the type of "deep-seated . . . antagonism" envisioned in *Liteky* that would arguably support a due-process claim of judicial bias.  First, the undersigned finds no bias was exhibited by the trial court toward petitioner when it properly sustained the prosecutor's objection to questions posed by defense counsel during cross-examination of a state witness regarding the victim's citizenship status.  In instructing the jury that the victim's citizenship "has no bearing on this case," the judge did remark that "everybody has a right to live." (*See* Doc. 12, Trial Tr. 316, at PAGEID#: 682).  However, the remark was made to explain why the victim's citizenship status was an irrelevant issue and did not even remotely amount to an expression of opinion regarding petitioner's guilt or innocence on the criminal charges.  Furthermore, to the extent that petitioner contends that the remark was prejudicial, it is highly unlikely that the jury would have interpreted the judge's general comment about everybody's "right to live" as reflecting any opinion about petitioner's guilt or as foreclosing any of petitioner's defenses.   In any event, as the Ohio Court of Appeals reasonably found, any possibility of prejudice was reduced, if not completely eliminated, when the trial judge expressly instructed the jury before it retired to deliberate to disregard anything that he may have said or done during the course of the trial that could be considered as indicating his "view on the facts" because he did "not have the right and d[id] not desire to invade the province of the jury by indicating in any way a preference between the State and the Defendant." (*See id.*, Trial Tr. 546, at PAGEID#: 918).

Finally, as the Ohio Court of Appeals reasonably concluded, the trial judge's comment at sentencing about the heinousness of the crime was not prejudicial because the jury had already rendered its verdicts of guilt by then.  In addition, the comment was made on the basis of facts introduced at trial regarding the events that had occurred and did not suggest that the judge held

27

a deep-seated antagonism toward the petitioner.  As the state appellate court pointed out, the trial

court was required to consider the seriousness of the offense in determining the appropriate

sentence to impose.  Here, the trial judge made the comment immediately before making

required findings under the state sentencing statutes based on the balancing of factors, including

the seriousness of the offense.  (*See id.*, Trial Tr. 553-54, at PAGEID#: 925-26).  It was,

therefore, reasonable for the Ohio Court of Appeals to conclude that the comment did not reflect

judicial bias, but rather reflected a justification for the sentence imposed in this case.

Accordingly, in sum, because petitioner has not shown that the Ohio Court of Appeals'

adjudication of his claim of judicial bias is contrary to or an unreasonable application of

established Supreme Court precedents that provide guidance in resolving the due-process issue,

petitioner is not entitled to habeas relief based on such claim.  Therefore, Ground Four of the

petition should be denied with prejudice.

**D.  Petitioner Is Not Entitled To Relief Based On His Claim In Ground Seven Challenging A Ruling That Precluded The Defense From Introducing Extrinsic Evidence Regarding Pending Charges Against A State Witness For Impeachment Purposes**

In Ground Seven of the petition, petitioner contends that the trial court erred when it

granted the State's motion in limine because he was prevented by that ruling "from appropriately

cross-examining [State] witness Steven Drummond."  (Doc. 1, at PAGEID#: 13).

The State filed the motion in limine on the morning of the first day of petitioner's trial

after learning that the defense "wish[ed] to inquire into the facts of . . . the witness[']s

indictment, which ha[d] not be[en] litigated and [was] currently pending."  (*See* Doc. 12, Trial

Tr. 2-3, at PAGEID#: 462-63).  In the motion, the State contended that the defense should not be

allowed to question Drummond about his "arrest record" for impeachment purposes because (1)

the record was not admissible under Ohio R. Evid. 609 as a "convict[ion] of a crime punishable

by death or imprisonment in excess of one year" and did not involve charges that were "clearly probative of truthfulness or untruthfulness" within the meaning of Ohio R. Evid. 608(B); and (2) the record could not be used for a "legitimate" impeachment purpose as the State had not "enter[ed] into any negotiations with Drummond [on the pending charges] in exchange for his testimony." (*See id.*, Ex. 6). In the memorandum filed in opposition to the State's motion in limine, defense counsel conceded that "[t]he charges for which the witness is currently indicted for do not appear to be charges of dishonesty." (*Id.*, Ex. 7, at PAGEID#: 101). Counsel contended, however, that it was permissible under Ohio R. Evid. 608(B) to introduce "extrinsic evidence" that the witness had "lied to the police in the investigation" leading to the current indictment because such evidence was "clearly probative of the truthfulness or the untruthfulness of the witness." (*Id.*). After listening to the parties' arguments at a conference held in chambers before the start of trial, the trial court granted the State's motion in limine. In granting the motion, the court stated: "Whether [the witness] told a lie or told the truth [in the pending case against the witness] is a separate matter, and to be decided by a separate jury. This is a whole completely different case here today." (*Id.*, Trial Tr. 5, at PAGEID#: 465).

Petitioner challenged the trial court's ruling on direct appeal. The Ohio Court of Appeals, which was the last state court to issue a reasoned decision addressing the matter, overruled the assignment of error. Citing Ohio evidentiary rules and case-law, the court reasoned in relevant part as follows:

> In his sixth assignment of error, Appellant contends that the trial court erred when it granted the State's motion in limine which prevented him from appropriately cross examining witness Steven Drummond. Appellant argues that he should have been permitted, under Evid.R. 608(B) to cross-examine Drummond regarding statements made to law enforcement during their investigation of an incident which subsequently led to a felony charge filed against Drummond, which Appellant argued were probative of Drummond's character for truthfulness or untruthfulness. Appellant further argues that his trial counsel was ineffective

29

for failing to cross examine Drummond regarding any plea deals he had been offered in exchange for his testimony.  It appears from the record that the charge against Drummond was still pending at the time of trial, and that he had not been convicted of the charge at that time.

**** 

Here, the State's motion in limine was filed at 7:51 a.m. on October 9, 2012, the morning of the first day of trial.  The trial court and counsel discussed the motion at length in chambers prior to the start of jury selection and the trial court granted the State's motion.  Mr. Drummond testified just three days later. . . .  [W]e will address Appellant's argument not in terms of the grant or denial of the motion in limine, but instead in terms of whether or not the trial court abused its discretion in excluding evidence which Appellant contends would have called Drummond's character for truthfulness and thus, his credibility, into question.

**** 

Evid.R. 608 governs evidence of character and conduct of a witness and provides in (B) that "[s]pecific instances of conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of a crime as provided in Evid.R. 609, may not be proved by extrinsic evidence."  "'Other than the Evid.R. 609 exception for certain criminal convictions, a witness's credibility may not be impeached by extrinsic proof of special instances of his conduct; such conduct may be inquired into only by the intrinsic means of cross-examination within the guidelines set forth in Evid.R. 608(B).  Criminal activities not resulting in conviction cannot ordinarily form the basis for an attack upon a witness's credibility.'". . .

Of importance, we initially note that the pending felony of which Drummond was charged has not been identified in the record.  However, in Appellant's memorandum contra the State's motion in limine, Appellant stated that "[t]he charges for which the witness is currently indicted for do not appear to be charges of dishonesty."  Nonetheless, Appellant argues that he should have been able to cross examine Drummond on an allegedly false statement provided to law enforcement during the course of the investigation related to Drummond's pending felony charge.  In making this argument, Appellant reasoned that if Drummond lied to police during the investigation, such conduct was probative of his character for truthfulness.

We reject Appellant's argument.  Drummond had not been convicted of the crime for which he was charged at the time of trial and, further, Appellant has conceded that crime was not a crime of dishonesty. . . .  Additionally, it had not been determined that the statement given to law enforcement by Drummond during the course of the investigation of his pending felony, which Appellant sought to introduce, was false.  As noted by the trial court in ruling on the motion in limine,

30

"[w]e're – we're not trying a separate case here. This – will be up to the jury to try it on his own case – his own case to make that determination." The trial court further stated "[w]hether he told a lie or told the truth is a separate matter, and to be decided by a separate jury. This is a whole completely different case here today, so I'm going to grant the State's motion." Based upon the foregoing, we find no abuse of discretion on the part of the trial court in excluding evidence of Drummond's pending charges or statements made to law enforcement during the investigation of those pending charges.

We now address Appellant's argument that his counsel provided ineffective assistance by failing to cross examine Drummond as to whether he had been offered a plea deal in exchange for his testimony. "The pendency of charges in another case or the witness's plea arrangement with the prosecutor is admissible to prove the bias of the witness.". . .

Here, there was no evidence that Drummond was offered a plea bargain or any other inducement to testify. In fact, the State expressly stated in its motion in limine as follows:

> "The State of Ohio did not enter into any negotiations with Drummond in exchange for his testimony; therefore, the admission of evidence or testimony regarding Drummond's charges would not be for legitimate purpose, such as bias."

We conclude that trial counsel could have reasonably relied upon this representation by the State, made in an official document filed with the court. Further, the fact that Drummond was incarcerated was disclosed to the jury during trial. As such, the jury was aware that Drummond may have some incentive to assist the State. Based upon these facts, we conclude Appellant's failure to cross-examine on this issue does not constitute ineffective assistance of counsel.

In light of the foregoing, we find no abuse of discretion on the part of the trial court in excluding the evidence at issue. Further, Appellant has failed to demonstrate ineffective assistance of trial counsel.

(*Id.*, Ex. 14, pp. 64-71, at PAGEID#: 268-75) (Ohio case citations omitted).

As a threshold matter, respondent has contended in the return of writ that Ground Seven is subject to dismissal because petitioner has not stated a claim of federal constitutional dimension and, alternatively, has waived such a claim because he failed to fairly present the constitutional issue to the state courts. (*See* Doc. 13, pp. 39-41, at PAGEID#: 968-70). The undersigned agrees that petitioner has not stated a cognizable claim to the extent he contends that

the trial court misapplied or misinterpreted Ohio's evidentiary rules or otherwise abused its

discretion under state-law standards in granting the State's motion in limine.  In this federal

habeas proceeding, the Court has jurisdiction to review petitioner's claims only to the extent that

petitioner challenges his confinement based on an alleged violation of the Constitution, laws or

treaties of the United States, and not "on the basis of a perceived error of state law."  28 U.S.C. §

2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Wilson v. Corcoran,* 562 U.S. 1, 5

(2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)) ("it is not the province of a

federal court to reexamine state-court determinations on state-law questions").  *Cf. Clark v.

O'Dea,* 257 F.3d 498, 503 (6th Cir. 2001) (quoting *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th

Cir. 1994)) ("Habeas review does not encompass state court rulings on the admission of evidence

unless there is a constitutional violation.").

However, this Court does have jurisdiction to consider whether the trial court's

evidentiary ruling violated petitioner's Sixth Amendment right to confront the witnesses against

him.  Contrary to respondent's contention, it appears that petitioner fairly presented the federal

constitutional issue to the state courts as he expressly stated in one of his briefs to the Ohio Court

of Appeals that he was prevented by the trial court's ruling "from fully exercising his sixth

amendment rights under the confrontation clause" and also asserted in his memorandum in

support of jurisdiction on further appeal to the Ohio Supreme Court that he was "prevented from

fully cross-examining the State's witnesses."  (*See* Doc. 12, Ex. 13, pp. 10-11, at PAGEID#:

201-02; *see also id.*, Ex. 16).  Moreover, the Ohio Court of Appeals addressed a corollary

ineffective-assistance-of-counsel claim, which presented another issue of federal constitutional

dimension under the Sixth Amendment.  Therefore, to the extent that petitioner has alleged a

violation of his federal constitutional rights in Ground Seven, the undersigned concludes that

those issues were exhausted and are subject to review on the merits by this Court.

The Sixth Amendment guarantees the criminal defendant the right, applicable to the states by way of the Fourteenth Amendment, "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Pointer v. Texas*, 380 U.S. 400 (1965). A "primary interest secured by [the Confrontation Clause] is the right of cross-examination," which "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (internal citation and quotation marks omitted); *see also Boggs v. Collins,* 226 F.3d 728, 736 (6th Cir. 2000) (and Supreme Court cases cited therein). However, the right "is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 285 (1973); *see also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish") (emphasis in original). The Supreme Court has stated that "trial judges retain wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, . . . or interrogation that is . . . marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

In *Davis*, 415 U.S. at 316, the Supreme Court explained that the introduction of a witness's prior conviction constitutes a "general attack on the credibility of the witness" to the extent that "the cross-examiner intends to afford the jury a basis to infer that the witness'[s] character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony." The Court went on to distinguish that type of general impeachment evidence from "a more particular attack on the witness'[s] credibility . . . by means of cross-examination

33

directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand."  *See id.*  The *Davis* Court explicitly recognized only the latter type of impeachment evidence, introduced to show the existence of possible bias or prejudice or improper motive on the part of the witness, as "a proper and important function of the constitutionally protected right of cross-examination."  *Id.* at 316-17; *see also Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 596 (6th Cir. 2012) (quoting *Boggs*, 226 F.3d at 736); *Olson v. Little*, 604 F. App'x 387, 395-96 (6th Cir.), *cert. denied*, 136 S.Ct. 551 (2015).  Indeed, Justice Stewart emphasized in his concurring opinion in *Davis* that "the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions."  *Davis*, 415 U.S. at 321 (Stewart, J., concurring).

The Sixth Circuit has held in accordance with Justice Stewart's concurring opinion in *Davis* that "cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not."  *Boggs*, 226 F.3d at 737; *see also Jordan*, 675 F.3d at 596 ("[o]nly the latter form of cross-examination—seeking evidence of bias or other motivations for the witness's testimony—is considered constitutionally protected because its importance outweighs any countervailing state interests").[7]  In so holding, the Sixth Circuit has

---

[7] In *Boggs*, 226 F.3d at 740, the Sixth Circuit concluded that the Confrontation Clause was not violated by application of Ohio's rape-shield law to bar an attack on the rape victim's general credibility through cross-examination about an alleged prior false accusation of rape that she had made.  In so ruling, the court reasoned that "[u]nder *Davis* and its progeny, the Sixth Amendment only compels cross-examination if that examination aims to reveal the motive, bias or prejudice of a witness/accuser" and "does not *require* that a defendant be given the opportunity to wage a general attack on credibility by pointing to specific instances of past conduct."  *Id.* (emphasis in original).  In a published decision issued after *Boggs* and prior to *Jordan*, a Sixth Circuit panel suggested in dicta that the *Boggs* court may have been wrong to "unquestioningly accept[] Justice Stewart's attempt to commandeer the majority opinion in *Davis*."  *Vasquez v. Jones*, 496 F.3d 564, 573-74 (6th Cir. 2007) (distinguishing *Boggs* in holding that the state courts had unreasonably applied *Davis* in finding no constitutional violation by the invocation of a state evidentiary rule to prevent the defense from impeaching an unavailable witness's hearsay testimony with

pointed out that the Supreme Court has neither held nor suggested "that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination." *Jordan*, 675 F.3d at 596 (quoting *Boggs*, 226 F.3d at 737).  Moreover, in addressing the specific question whether the exclusion of extrinsic evidence sought to be introduced for impeachment purposes violates any clearly-established Supreme Court precedents, the *Jordan* court noted that "neither the Supreme nor any federal court of appeals has ever held—or even suggested—that the longstanding rules restricting the use of specific instances and extrinsic evidence to impeach a witness's credibility pose constitutional concerns." *Id.* at 597 (quoting *Farley v. Lafler*, 193 F. App'x 543, 547 (6th Cir. 2006)).  The court, therefore, concluded that "a defendant is generally unable to establish a confrontation-clause violation where he or she is denied the opportunity to present extrinsic evidence that would impeach another witness." *Id.*  The Supreme Court cited the Sixth Circuit's *Jordan* decision with approval in pointing out that it has "never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." *Nevada v. Jackson*, __ U.S. __, 133 S.Ct. 1990, 1994 (2013) (emphasis in original).

In this case, it is clear from the record that the defense sought to introduce extrinsic evidence regarding the pending indictment against Drummond to attack Drummond's general credibility and not to expose any particular bias or motive he may have had to testify against petitioner.  Furthermore, as the trial court pointed out in granting the State's motion in limine, the evidence that the defense sought to introduce to establish that the witness was a liar involved a collateral issue to be decided in the pending case against the witness rather than in petitioner's criminal trial.  The trial judge, therefore, acted within the "wide latitude" permitted under the

---

the witness's prior convictions).  However, as discussed herein, any such suggestion has since been undermined by the Sixth Circuit in *Jordan*, 675 F.3d at 596-97, and the Supreme Court in *Nevada v. Jackson*, __ U.S. __, 133 S.Ct. 1990, 1994 (2013).

Constitution to impose the reasonable limit on cross-examination out of concern about

"harassment, prejudice, confusion of the issues, or interrogation that is ... marginally relevant" if

inquiry into the collateral matter were allowed.  *See Van Arsdall*, 475 U.S. at 679.

As the Ohio Court of Appeals properly recognized in this case, the pending charges

against Drummond would have been admissible for the specific purpose of showing that

Drummond may have been biased or motivated to testify against petitioner in order to gain

leniency in his own case.  *Cf. Latimer v. Burt*, 98 F. App'x 427, 431 (6th Cir. 2004); *see also*

*Van Arsdall,* 475 U.S. at 679 (involving restriction on cross-examination that "prohibited *all*

inquiry into the possibility that [a key prosecution witness] would be biased as a result of the

State's dismissal of his pending public drunkenness charge" in exchange for his testimony

against the petitioner); *Davis,* 415 U.S. at 311, 319-20 (involving restriction on cross-

examination that prohibited the introduction of a key prosecution witness's juvenile adjudication

not "as a general impeachment of [the witness's] character as a truthful person but, rather, to

show specifically that at the same time [the witness] was assisting the police in identifying

petitioner he was on probation for burglary" and thus made his identification to shift suspicion

from himself or out of fear of possible probation revocation).  However, defense counsel never

suggested to the trial court that he sought to cross-examine Drummond about the pending

charges for that purpose.  To the extent that petitioner has alleged his counsel was ineffective for

failing to do so, he has not demonstrated that the alleged error amounted to a constitutional

violation.

To establish that his trial counsel provided ineffective assistance in violation of the Sixth

Amendment, petitioner was required to demonstrate both (1) his trial attorney's conduct was

constitutionally deficient; and (2) the attorney's deficient performance prejudiced the defense.

*See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the first prong of the *Strickland* test, petitioner had to show that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. To satisfy the second "prejudice" prong of the *Strickland* test, petitioner had to demonstrate that a "reasonable probability" exists that, but for his counsel's alleged error, the result of his trial would have been different. *See id.* at 694. That burden is satisfied only by a showing that the result of the trial would "reasonably likely have been different absent the error[]." *Id.* at 695.

Here, as the Ohio Court of Appeals pointed out, the prosecutor averred in the motion in limine that the State had not entered into any negotiations with Drummond in exchange for his testimony and that there was simply "no evidence that Drummond was offered a plea bargain or any other inducement to testify." (*See* Doc. 12, Ex. 6, at PAGEID#: 99). Petitioner has neither argued nor proffered evidence that the prosecutor's statement was false or misleading. Therefore, it was reasonable for the state appellate court to conclude that petitioner's counsel acted within the wide range of reasonable professional assistance to the extent the attorney relied on the State's representation as a basis for not pursuing cross-examination about the pending charges for the purpose of showing bias or improper motive on the part of Drummond. Indeed, given the prosecutor's representation, it was imminently reasonable for petitioner's counsel to conclude that cross-examination about the pending charges for that purpose would not only prove fruitless, but could also back-fire and actually prejudice the defense by further bolstering Drummond's credibility based on a showing of lack of bias or motive.

Accordingly, in sum, petitioner has not demonstrated that he is entitled to habeas relief based on his claim in Ground Seven challenging the trial court's granting of the State's motion in limine, which precluded the admission of evidence regarding pending charges against State

witness Steven Drummond for impeachment purposes.  To the extent petitioner claims that the

trial court misapplied or misinterpreted Ohio's evidentiary rules or otherwise abused its

discretion under state-law standards in granting the motion in limine, he has not stated a

cognizable ground for federal habeas relief.  To the extent that petitioner has alleged he was

denied his Sixth Amendment right to confront an adverse witness and was denied the effective

assistance of counsel in the matter, petitioner has not shown that "fairminded jurists could

disagree" that the Ohio Court of Appeals' adjudication of those claims is contrary to applicable

Supreme Court precedents or "was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded

disagreement."  *See Harrington*, 562 U.S. at 102-03.  Therefore, Ground Seven of the petition

should be denied with prejudice.

### E.  Petitioner Is Not Entitled To Habeas Relief Based On The Ineffective-Assistance-Of-Trial-Counsel Claims Alleged In Ground Six Of The Petition

In Ground Six of the petition, petitioner claims that he was denied his Sixth Amendment

right to the effective assistance of counsel during the trial proceedings.  (Doc. 1, at PAGEID#:

12).  Petitioner specifically alleges that his trial counsel was ineffective for failing to (1) file a

motion to suppress, (2) request independent DNA testing of evidence, (3) request a curative

instruction on hearsay, (4) object to improper opinion testimony, (5) object to the trial court's

instruction regarding the victim's immigration status, (6) object to the State's presentation at trial

of a "theory of events" that differed from the bill of particulars, and (7) call any witnesses on

petitioner's behalf.  (*Id.*).

In the return of writ, respondent contends that petitioner procedurally defaulted and has

waived the ground for relief even though some of petitioner's sub-claims were raised to and

considered "in detail" by the Ohio Court of Appeals on direct appeal.  (*See* Doc. 13, pp. 36-39, at

PAGEID#: 965-68; *see also* Doc. 12, Exs. 11, 14).   Respondent argues that the claim was

defaulted on further appeal to the Ohio Supreme Court because petitioner only generally referred

to issues of "ineffective assistance of counsel" in his third proposition of law without mentioning

"any specific factual support" for the claim.  (Doc. 13, p. 36, at PAGEID#: 965).  Respondent

also contends that petitioner committed another default when he failed to comply with Ohio

appellate procedural rules that were relied on by the Ohio Court of Appeals in rejecting his

seventh sub-claim challenging defense counsel's failure to call witnesses at trial.  (*See id.*, p. 38,

at PAGEID#:  967).

　　　　As respondent has argued, petitioner procedurally defaulted and has waived the sub-claim

that his counsel was ineffective for failing to call defense witnesses.  The Ohio Court of Appeals

declined to address that particular claim because petitioner failed to argue the "alleged error in

the body of his brief" as required by Ohio R. App. P. 16(A).  (*See* Doc. 12, Ex. 14, p. 64, at

PAGEID#: 268).  It is well-settled under the procedural default doctrine discussed above in

addressing Grounds Eight and Nine of the petition, *see supra* pp. 9-10, that the federal habeas

court may be barred from considering an issue of federal law from a judgment of a state court if

that judgment rests on a state-law ground that is both "independent" of the merits of the federal

claim and an "adequate" basis for the state court's decision.  *See, e.g., Harris v. Reed,* 489 U.S.

255, 260-62 (1989).  Here, the Ohio Court of Appeals rejected the particular claim of ineffective

assistance in accordance with Ohio R. App. P. 12(A)(2), which permitted the court to "disregard

[the] assignment of error presented for review" because "the party raising it fail[ed] . . . to argue

the assignment separately in the brief, as required by App. R. 16(A)."  The court's reliance on

the clearly-established state procedural ground constitutes an independent and adequate basis for

its decision.  The Ohio Supreme Court's unexplained ruling declining to accept jurisdiction of

petitioner's appeal is presumed to rely on that same state procedural ground.  *See Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991).  Therefore, the federal issue raised in petitioner's seventh sub-claim is barred from review in the absence of any showing by petitioner of cause for and prejudice from his procedural default or that a fundamental miscarriage of justice will occur if the defaulted federal issue is not considered by this Court.  *See Hoffner v. Bradshaw*, 622 F.3d 487, 497 (6th Cir. 2010) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

It further appears from the record that petitioner's sixth sub-claim is procedurally defaulted because petitioner also omitted that particular claim from the body of his appellate brief.  (*See* Doc. 12, Ex. 11).  Although, like the seventh sub-claim, the sixth sub-claim was included in petitioner's list of assignments of error, petitioner did not assert it as an issue to be addressed by the court when presenting his ineffective-assistance-of-trial-counsel claims and arguments in support of them in the substance of his brief.  (*See id*., pp. 4-5, 24, at PAGEID#: 135-36, 155).  The Ohio Court of Appeals did not address the sixth sub-claim in its direct appeal decision.  (*See id.*, Ex. 14).  Apparently, the court was not adequately apprised of that particular claim because, given its disposition of the seventh sub-claim, it is highly likely the court would have also rejected the sixth sub-claim on the same state procedural ground.  In any event, because petitioner only generally referred to "issues" of "ineffective assistance of counsel" in his brief on further appeal to the Ohio Supreme Court, the state's highest court was not made aware of any sub-claim that was not specifically addressed by the Ohio Court of Appeals in its direct appeal decision.  Therefore, in the absence of a showing by petitioner of a fundamental miscarriage of justice or of cause for and prejudice from the defaults that occurred due to his omission of the sub-claim from the body of his appellate brief, *see Hoffner*, 622 F.3d at 497, the undersigned finds that petitioner has also waived the sub-claim that his counsel was ineffective

for failing to object to the State's presentation at trial of a theory of events that differed from the bill of particulars.

However, the undersigned will assume in petitioner's favor that he fairly presented his remaining ineffective-assistance-of-trial-counsel claims, which were raised to and considered by the Ohio Court of Appeals on the merits, in his memorandum in support of jurisdiction to the Ohio Supreme Court. Although the question is admittedly a close one, an argument can be made that petitioner's general reference in the third proposition of law to "issues" of "ineffective assistance of counsel" implicitly included the specific issues that were addressed by the Ohio Court of Appeals in the challenged direct appeal decision, which was also included as an attachment to the memorandum in support of jurisdiction. (*See* Doc. 12, Ex. 16). Moreover, contrary to respondent's contention, petitioner did specifically mention in the third proposition of law that "the dissenting opinion found that [his] trial attorney was ineffective for failing to file a motion to suppress." (*See id.*, p. 15, at PAGEID#: 315).

In addressing the claims of ineffective assistance that were argued on direct appeal, the Ohio Court of Appeals correctly identified and applied the two-prong standard of review established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). (*See* Doc. 12, Ex. 14, p. 49, at PAGEID#: 253). As the state appellate court recognized, to prevail on those claims, petitioner was required to show both (1) his trial attorney's challenged conduct was constitutionally deficient; and (2) the attorney's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687. Under the first prong of the *Strickland* test, petitioner had to show that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. Judicial scrutiny must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to

41

eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time the conduct occurred. *Id.* at 689. In determining whether or not counsel's performance was deficient, the court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance. *Id.*

To satisfy the second ″prejudice″ prong of the *Strickland* test, petitioner had to demonstrate that a "reasonable probability" exists that, but for his counsel's alleged error, the result of his trial would have been different. *See Strickland,* 466 U.S. at 694. That burden is satisfied only by a showing that the result of the trial would ″reasonably likely have been different absent the error[]." *Id.* at 695.

The court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by counsel's performance. The court may dispose of an ineffective-assistance-of-counsel claim by finding that petitioner made an insufficient showing on either ground. *Id.* at 697.

In this federal habeas action, this Court must employ a "doubly deferential" standard of review in evaluating the reasonableness of the Ohio Court of Appeals' adjudication of petitioner's claims of ineffectiveness under *Strickland. See Woods v. Daniel,* __ U.S. __, 135 S.Ct. 1372, 1376 (2015); *Burt v. Titlow*, __ U.S. __, 134 S.Ct. 10, 13 (2013); *Premo v. Moore*, 562 U.S. 115, 122-23 (2011) (quoting *Harrington*, 562 U.S. at 104-05); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Although "[s]urmounting *Strickland*'s high bar is never an easy task," *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)), the AEDPA requires that a second layer of deference be accorded the state courts' adjudication of ineffective-assistance-of-counsel claims. The Supreme Court has explained:

> Even under *de novo* review, the [*Strickland*] standard for judging counsel's representation is a most deferential one. . . .

42

****

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so. . . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial. . . . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689, and *Knowles*, 556 U.S. at 123); *see also Premo*, 562 U.S. at 122-23. Therefore, on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 U.S. at 101.

The Court turns now to examine under the requisite "doubly deferential" standard of review each of petitioner's non-defaulted allegations of ineffectiveness that were determined by the Ohio Court of Appeals to be lacking in merit under *Strickland*.

### 1. Failure To File Suppression Motion

Plaintiff has claimed that his counsel was ineffective for failing to file a motion to suppress statements he made during his police interview because he invoked his right to counsel "on two back-to-back occasions" during that interview. (*See* Doc. 12, Ex. 11, p. 25, at PAGEID#: 156; *see also id.*, Ex. 14, p. 50, at PAGEID#: 254). After reviewing the trial record, the Ohio Court of Appeals determined in the majority opinion that "the filing of a motion to suppress would have been futile" and, therefore, petitioner was unable to demonstrate that his counsel's omission "constituted deficient performance" under the first prong of the *Strickland*

test.  (*Id.*, Ex. 14, p. 57, at PAGEID#: 261).[8]  In so ruling, the court made findings of fact, which

are presumed correct under 28 U.S.C. § 2254(e)(1), *see supra* p. 2 n.2, and reasoned in pertinent

part as follows:

> The trial transcript includes a transcription of Appellant's interview video that
> was played for the jury.  The interview begins with Detective Conkel informing
> Appellant that she had already spoken with Linkous and Stenihauer, had been
> informed that the victim's cell phones and a hatchet had been recovered, and that
> there was a video of Appellant and the others getting gas at Kroger.  It was after
> Conkel next represented to Appellant that Steinhauer had admitted to stabbing the
> victim, and then suggested that Appellant was in the truck, and had hit the victim
> in the head with a hatchet, that Appellant made his first mention of desiring an
> attorney.  The transcript indicates that during Appellant's interrogation, the
> following exchange took place between Appellant and Detective Conkel:
>
>> "Conkel:  Tell me what happened.  There's four people in this
>> vehicle.  Okay.  You're one of them.
>>
>> Defendant:  I want a lawyer.
>>
>> Conkel:  Okay. That's your choice.
>>
>> Defendant:  I want a lawyer because I don't feel like anybody's
>> going to go to bat for me at all.  You guys are just going to charge
>> me with some murder that I didn't do.
>>
>> Conkel:  Okay.
>>
>> Defendant:  And lock me up and throw away the key.  I mean, I
>> understand –
>>
>> Conkel:  Okay.  You want an attorney, so we're going to give you
>> a chance to get an attorney.
>>
>> Defendant:  Well, I'm just saying I understand how you guys do
>> things.  You know, you're saying I'm guilty, but I'm not.
>>
>> Conkel:  Well, I'm going to tell – what I'm going to tell you is

---

[8] As petitioner pointed out in his memorandum in support of jurisdiction to the Ohio Supreme Court, one
member of the three-judge appellate panel disagreed with the majority's determination.  The dissenting judge would
have sustained the assignment of error, as well as two other assignments of error, and would have reversed and
remanded the case for new trial based on those "cumulative errors."  (*See* Doc. 12, Ex. 14, pp. 88-92, at PAGEID#:
292-96).

we've got eyewitnesses who can place you out on 104, who can place you at the place where it was burnt, and place you where the gas was bought.  Okay, I'm just –

Defendant:  But I didn't buy gas.  I bought cigarettes.

Conkel:  Right.  Jimmy paid for the gas.  I know that.  Like [I] said, you want an attorney.  We'll take you over to jail.  I'll tell you what you'll be charged with tonight.  It looks like it will be aggravated murder.

Defendant:  Jesus Christ, you're kidding me?

Conkel:  It'll be tampering with evidence.

Defendant:  Tampering with evidence?

Conkel:  Abuse of a corpse.

Defendant:  What do you mean abuse of a corpse?

Conkel:  Those are all charges involved in the crimes that were done tonight.

Defendant:  But I didn't do none of those things.

Conkel:  Like I said, you – do you want to talk to me without an attorney or do you want an attorney, because I can hear your side of the story, but that's only if you want to talk to me.  That's totally up to you.

Defendant:  But my side of the story – you're going to hang me out to dry.

Conkel:  Honey, I'm not hanging you out to dry.

Defendant:  I don't understand.

Conkel:  I wasn't there.  I didn't do this.  I didn't see anything. I'm just telling you what the evidence says, and I'm just telling you what we've got.  What we've seen.  We've got people who place[] you where . . . the vehicle was on fire, which I already know Jimmy set it on fire.  Jimmy's the one who set it on fire. He's admitted to that.  Lit a rag, threw it in the truck.  He's . . . taking the blame for that.  Okay.  I've got witnesses placing you there, I've got you at Kroger's, and I've got witnesses drove by

[that] seen you on 104 where the incidents were taking place.

Defendant:  I didn't kill the man.

Conkel:  It's up to you – do you – do you want to continue – do you want to talk to me without an attorney or do you want me to take you on over?  That's your choice, because you told me you wanted an attorney, so I have to ask you.

Defendant:  Him and Thomas got into a fight in the truck and he stabbed the living shit out of him."

When dealing with a claim that law enforcement continued to interrogate the accused after he invoked his right to counsel, the first question is "whether the accused actually invoked his right to counsel." *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).  "It is fundamental that once a suspect invokes his right to counsel, all interrogation must cease.". . .  "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).  "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [the Court's] precedents do not require the cessation of questioning."  Id.  "Rather, the suspect must unambiguously request counsel."  Id. As the Supreme Court observed, "'a statement either is such an assertion of the right to counsel or it is not.'"  Id.; quoting *Smith v. Illinois*, 469 U.S. 91, 97-98.

Second, if we find that the accused did invoke his right to counsel, we "may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."  *Smith v. Illinois* at 95; citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).  "[A]n accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Edwards* at 484-485. . . .  "[I]nquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in Edwards [v. Arizona]."  *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830 (1983).  Though the Supreme Court declined to fully define the term "initiate," it did note that "a willingness and a desire for a generalized discussion about the investigation * * * not merely a necessary inquiry arising out of the incidents of the custodial relationship" was sufficient to show initiation.  *Bradshaw* at 1045-1046.

Here, there has been no argument made that Appellant was not advised of his *Miranda* rights; thus, that issue is not in dispute.  Further, the fact that Appellant made an unequivocal request for counsel soon after the interrogation began is not in dispute.  At issue, however, is whether Appellant subsequently waived his right to counsel and to remain silent after initially invoking those rights, by re-initiating conversation with Detective Conkel regarding the incident.

A review of the transcript indicates that Appellant made unequivocal statements that he wanted a lawyer; however, the transcript also reveals that Detective Conkel responded "okay" each time, only for Appellant to continue talking and engaging with her.  In fact, after Appellant made two requests, but continued to talk, Detective Conkel then followed up by specifically asking Appellant two different times whether he wanted to talk to an attorney or whether he wanted to talk to her. Both times Appellant continued to talk to Conkel.

Although Detective Conkel continued to engage with Appellant when he continued talking with her, her comments were statements, rather than questions, regarding the crimes Appellant would be charged with once he was taken over to the jail, based upon the evidence gathered at the time.  We believe these statements are properly classified as statements by a police officer relating to routine incidents of the custodial relationship, as described in *Oregon v. Bradshaw*.  The only questions asked by Detective Conkel after Appellant requested counsel were made in response to Appellant's continued conversation, and were asked to clarify whether Appellant wanted to keep talking to her, or whether he did, in fact, want counsel.  Both times he was asked, Appellant made substantive statements about the investigation, rather than re-asserting his desire for counsel.  For instance, Appellant continued to state that he didn't believe anyone would "go to bat" for him, that he bought cigarettes, not gas at Kroger, that he had not committed any crimes, and ultimately that he didn't kill the victim but that Steinhauer had stabbed him.

We believe, based upon these facts, that despite Appellant's unequivocal request for counsel, Appellant subsequently waived his right to counsel by re-initiating conversation with Detective Conkel. . . .  In light of this determination, we necessarily must conclude that the filing of a motion to suppress would have been futile. . . .

(*Id.*, pp. 50-57, PAGEID#: 254-61) (Ohio case citations omitted).

Here, the Ohio Court of Appeals essentially determined that petitioner's counsel was not

ineffective for failing to file a suppression motion because petitioner's underlying Fifth

Amendment claim lacks merit.  Therefore, this Court's inquiry necessarily turns on whether the

Ohio Court of Appeals' assessment of the Fifth Amendment issue both accords with and involves a reasonable application of well-established Supreme Court precedents governing that issue. As the Ohio Court of Appeals understood, it has long been well-settled by the Supreme Court that police officers must "cease questioning a suspect who unequivocally invokes his right to counsel" and that the prosecution "cannot use statements made after the suspect requests counsel if those subsequent statements are the result of further police-initiated interrogation." *See McKinney v. Hoffner*, 830 F.3d 363, 370 (6th Cir. 2016) (citing *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966); *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Smith v. Illinois*, 469 U.S. 91, 100 (1984)). Under the *Edwards* rule, if the suspect invokes his right to counsel, his subsequent responses to further police questioning are admissible at trial "only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith,* 469 U.S. at 95 (citing *Edwards*, 451 U.S. at 485, 486 n.9).

The Supreme Court has provided some general guidance for making determinations as to when a discussion has been "initiated" or "interrogation" has occurred in this context. The Court has defined "interrogation" as including "not only . . . express questioning," but also its "functional equivalent"—*i.e.*, "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *McKinney*, 830 F.3d at 370-71 (quoting *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980)). In *Innis*, the Supreme Court cited the following "techniques of persuasion" in the custodial setting as examples of the "functional equivalent" of express questioning: the use of line-ups or reverse line-ups in which the defendant is identified by a coached witness as the perpetrator of a crime; and the "use of psychological ploys," which

48

include positing the guilt of the defendant, minimizing the seriousness of the offense, and casting

blame on the victim or society.  *Innis*, 446 U.S. at 299 (internal citation and quotation marks

omitted); *see also McKinney*, 830 F.3d at 372.  However, as the Sixth Circuit recently

emphasized in *McKinney*, "[t]he Supreme Court has provided little additional guidance on what

constitutes the functional equivalent of express questioning" other than generally stating in *Innis*,

446 U.S. at 303, that the lower court had erred "in equating 'subtle compulsion' with

interrogation" and suggesting in another case that "interrogation may be limited to 'compelling

influences, psychological ploys, or direct questioning.'"  *McKinney,* 830 F.3d at 371 (citing *Innis*

and quoting *Arizona v. Mauro*, 481 U.S. 520, 529 (1987)).  Therefore, as the Sixth Circuit went

on to conclude, "*Innis* . . . provides a very general rule," which gives the courts "more leeway . . .

in reaching outcomes in case-by-case determinations."  *Id.* (quoting *Yarborough v. Alvarado*,

541 U.S. 652, 664 (2004); citing *Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 2155 (2012)

(per curiam)).

Similarly, in addressing the initiation issue, the Supreme Court has expressed doubt about

the desirability of "build[ing] a superstructure of legal refinements around the word 'initiate.'"

*Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983).  However, as the Ohio Court of Appeals

expressly acknowledged in this case, the *Bradshaw* Court provided some guidance for

determining whether a conversation has been initiated by the defendant or the police to the extent

the Court stated that "inquiries or statements, by either the accused or a police officer, relating to

routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the

sense in which that word was used in *Edwards*."  *See id.*  Moreover, in addressing whether the

defendant had waived a previously invoked right to counsel under the two-part *Edwards* rule, the

Court held that the defendant had "initiated" further discussions with the police by making an

inquiry that "could reasonably have been interpreted by the officer" as "evinc[ing] a willingness and a desire for a generalized discussion about the investigation" as opposed to a "necessary inquiry arising out of the incidents of the custodial relationship." *See id.* at 1045-46.  In turning to the next inquiry as to whether the defendant made a knowing and intelligent waiver of his previously invoked right to counsel, the Court found "no reason" to dispute the state trial court's finding that the defendant had validly waived the right based on "the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* at 1046 (quoting *Edwards*, 451 U.S. at 486 n.9).

In this case, as the Ohio Court of Appeals recognized, it is undisputed that petitioner made two back-to-back unequivocal requests for counsel during his police interview with Detective Conkel.  Therefore, the issue confronting the court was whether petitioner initiated the conversation with Conkel that occurred after the requests were made and knowingly and intelligently waived the right he had invoked under the two-part standard established in *Edwards*. Upon review of the trial transcript and the Supreme Court precedents addressing the Fifth Amendment issue, the undersigned concludes that the Ohio Court of Appeals' determination that the right was waived is neither contrary to nor involves an unreasonable application of *Edwards* and its progeny.

As the state appellate court reasonably found, when petitioner invoked his right to counsel, Detective Conkel ceased questioning him. (*See* Doc. 12, Trial Tr. 259, at PAGEID#: 625).  When petitioner continued talking immediately after saying he wanted a lawyer, Conkel reminded him that he had requested an attorney and that "we're going to give you a chance to get an attorney." (*Id.*, Trial Tr. 260, at PAGEID#: 626).  Despite the reminder, petitioner kept on talking, protesting that he was innocent while "you're saying I'm guilty." (*Id.*).  At that point,

Conkel did not begin questioning petitioner, but rather only made a few statements about the evidence of guilt that had previously been relayed in greater detail to petitioner before he said he wanted an attorney.  (*See id.*, Trial Tr. 256-60, at PAGEID#: 622-26).  Conkel then again reminded petitioner that he had requested counsel and, therefore, would be taken to the jail.  (*See id.*, Trial Tr. 260, at PAGEID#: 626).  She further advised petitioner of the criminal charges that would likely be brought against him that night.  (*Id.*).  When petitioner responded to that information by making more statements about his innocence and being "h[u]ng out to dry," Conkel replied with a few statements reiterating the evidence of guilt that had previously been relayed to him, and also twice asked petitioner whether he wanted to continue talking to her without an attorney or whether he did, in fact, want counsel as he had previously requested.  (*See id.*, Trial Tr. 260-61, at PAGEID#: 626-27).  As the Ohio Court of Appeals noted, both times that he was asked that question, petitioner responded by continuing to talk rather than reasserting his request for counsel.  (*See id.*, Trial Tr. 261, at PAGEID#: 627).  Only after petitioner responded to Conkel's second direct question as to whether he still wanted an attorney by giving his first incriminatory statement placing him in the truck when the victim was stabbed by Steinhauer did Conkel recommence her interrogation of petitioner.  (*See id.*).

In light of the transcribed colloquy discussed above that took place between petitioner and Detective Conkel, it was reasonable for the Ohio Court of Appeals to find that petitioner, rather than Conkel, initiated the further conversation.  Whereas Conkel ceased interrogating petitioner when he expressed his desire for counsel, petitioner continued to make statements that could have reasonably been interpreted by Conkel as "evinc[ing] a willingness and a desire for a generalized discussion about the investigation."  *See Bradshaw*, 462 U.S. at 1045-46.  Furthermore, Conkel's responses to the statements that petitioner made after he invoked his right

to counsel do not rise to the level of police-initiated interrogation. Although Conkel did respond to petitioner's continued protestations of innocence by referring to evidence of his guilt, her statements do not trigger concerns about the use of a "psychological ploy" or the use of "compelling influences" that Conkel should have known were "reasonably likely to elicit an incriminating response." *See McKinney*, 830 F.3d at 370-71 (quoting *Innis,* 446 U.S. at 300-01). Conkel's statements merely reiterated information that had previously been relayed to petitioner in much greater detail before he even requested counsel. Moreover, throughout their conversation, Conkel expressed to petitioner on a number of occasions that he had said he wanted counsel and that she would honor that request unless he chose to continue talking to her without an attorney. Finally, to the extent that Conkel informed petitioner of the charges that would be brought against him, it was reasonable for the Ohio Court of Appeals to find that those statements related to the "routine incidents of the custodial relationship" as opposed to any initiation on the part of Conkel to continue petitioner's interrogation. Indeed, at the time Conkel made those statements, it appears that she was under the impression that because petitioner had requested an attorney, the interview was at an end and he would to be taken to the jail. Therefore, under the deferential standard of review that must be applied in this habeas case, *cf. McKinney*, 830 F.3d at 371-72, the undersigned concludes that the Ohio Court of Appeals did not unreasonably determine under the first prong of the *Edwards* rule that petitioner was the one who initiated the further discussions with Conkel after invoking his right to counsel. Given that petitioner continued to talk with Conkel despite her several reminders to him that he had requested counsel and given that petitioner did not reassert his desire for counsel even after he was directly asked on two occasions whether he wanted counsel or wanted to continue the interview with Conkel without an attorney present, it was also reasonable for the Ohio Court of

Appeals to conclude under the second prong of the *Edwards* rule that petitioner knowingly and intelligently waived the right to counsel by initiating the further discussion with Conkel.

Accordingly, in sum, the undersigned concludes that the Ohio Court of Appeals' assessment of petitioner's underlying Fifth Amendment claim both accords with and amounts to a reasonable application of the well-established Supreme Court precedents governing that issue. Because it was reasonable for the state appellate court to find that petitioner waived the right to counsel that was invoked during his police interview, the Ohio Court of Appeals' resolution of petitioner's ineffective-assistance-of-counsel claim is neither contrary to nor involves an unreasonable application of *Strickland*.  It was imminently reasonable for the Ohio Court of Appeals to determine that because the claim petitioner argued should have been raised in a motion to suppress lacked merit, counsel's failure to file a suppression motion did not fall outside the wide range of reasonable professional assistance under the first prong of the *Strickland* test.  Therefore, petitioner has not demonstrated that he is entitled to habeas relief based on the merits of that claim of ineffectiveness.

**2.   Failure To Request Independent DNA Testing**

Petitioner has alleged that his trial counsel was ineffective for failing to request independent DNA testing of the hatchet allegedly used as a murder weapon before the hatchet was lost by the Scioto County Sheriff's Department.  (*See* Doc. 12, Ex. 11, p. 26, at PAGEID#: 157; *see also id.*, Ex. 14, p. 58, at PAGEID#: 262).  The Ohio Court of Appeals rejected that claim, reasoning in relevant part as follows:

> Here, there is no way Appellant's trial counsel could have known or anticipated that the hatchet would be lost.  Appellant was indicted for the crimes at issue on March 26, 2012.  Appellant's counsel promptly filed a motion to preserve evidence on April 4, 2012, which was granted the next day.  As soon as trial counsel was informed of the loss of the hatchet on October 2, 2012, he filed a motion to dismiss based upon the loss of the evidence, and in the alternative, a

motion prohibiting the use of any and all testimony about the knife and hatchet. These motions were denied by the trial court and we have determined . . . the trial court did not err in denying those motions, as Appellant had not demonstrated bad faith on the part of the State in connection with the loss of the evidence.

Based upon the information before us, it appears trial counsel intended to request independent DNA testing as a motion to preserve evidence was filed.  Whether trial counsel simply ran out of time when it was determined that the hatchet was missing, or whether trial counsel made a strategic[] decision not to have the evidence independently tested in light of the State's test results cannot be determined and calls for speculation, which is not a proper function of this Court. Although trial counsel could have requested independent testing in a more timely fashion, had it been his plan and intention to do so, and as set forth above, there was no way that the loss of the evidence could have been anticipated.

Additionally, other courts have reasoned that "'[t]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'". . .  Here, the State presented Raymond Peoples as their expert and defense counsel cross-examined Peoples regarding the DNA tests he performed. Further, . . . Appellant fails to set forth any argument that the DNA testing the State's expert performed was faulty or unreliable. . . .

Under these facts, we cannot conclude that counsel's performance was deficient or prejudicial.  Further, it is reasonable that once it was determined by the State's expert that Appellant's DNA was present on the hatchet, contrary to Appellant's claim that he never touched the hatchet, that counsel made a strategic[] decision not to obtain independent testing.

(*Id.*, Ex. 14, pp. 58-60, at PAGEID#: 262-64) (Ohio case citations omitted).

The Ohio Court of Appeals reasonably applied the two-part *Strickland* standard in finding

that petitioner had not demonstrated that his counsel's challenged conduct was either "deficient"

or "prejudicial" under that standard.   First, it was reasonable for the state appellate court to

conclude that counsel's performance fell within the wide range of reasonable professional

assistance because (1) the loss of the hatchet, which the State had been ordered to preserve, could

not have been anticipated if counsel had indeed planned to have it independently tested before

commencement of the trial; and (2) after forensic testing of the hatchet revealed the presence of

petitioner's DNA on the handle, counsel could have reasonably decided as a matter of trial

54

strategy not to seek independent testing of the weapon in light of petitioner's statements to the police denying that he had anything to do with the hatchet.  In any event, in the absence of any evidence in the record to support the speculative theory that independent testing would have resulted in findings favorable to petitioner, petitioner is unable to demonstrate either that counsel acted unreasonably or that a "reasonable probability" exists that, but for counsel's alleged error, the result of the trial would have been different.  *See Strickland,* 466 U.S. at 688, 694; *cf. Hodge v. Haeberlin,* 579 F.3d 627, 651 (6th Cir. 2009) ("Mere speculation that additional investigation would have uncovered wrongfully withheld exculpatory evidence does not establish either that counsel acted unreasonably or that [the petitioner] was prejudiced."); *Issa v. Bagley*, No. 1:03cv280, 2015 WL 5542524, at *31 (S.D. Ohio Sept. 21, 2015) (Beckwith, J.) (citing *Wiles v. Bagley*, 561 F.3d 636, 641 (6th Cir. 2009)) (in rejecting the petitioner's claim that his counsel was ineffective for failing to retain a psychologist for the purpose of a "more comprehensive investigation" that "would have been better or perhaps more helpful," the court stated that "[s]peculation about additional investigative efforts and whether they might have altered the trial result does not establish . . . prejudice" under *Strickland*), *appeal filed*, No. 15-4147 (6th Cir. Oct. 22, 2015).  In the absence of such a showing, petitioner's claim of ineffectiveness lacks merit.

### 3.  Failure To Request Curative Instruction On Hearsay

Plaintiff has contended that his counsel was ineffective for failing to request a curative instruction regarding hearsay statements attributable to the two co-defendants, which were brought out by Detective Conkel in her videotaped interview of petitioner that was introduced into evidence at trial.  (*See* Doc. 12, Ex. 11, p. 27, at PAGEID#: 158; *see also id.*, Ex. 14, p. 60, at PAGEID#: 264).  The Ohio Court of Appeals first found the claim was "arguably moot" in

light of its determination that petitioner's "confrontation rights were technically violated by virtue of the allowance into evidence of [his] co-defendants['] hearsay statements through the testimony of Detective Conkel."[9] (*See id.*, Ex. 14, pp. 60-61, at PAGEID#: 264-65).  The court then went on to reject petitioner's claim of ineffectiveness, reasoning in pertinent part as follows:

> [W]e are unwilling to conclude counsel was ineffective in any regard with respect to the admission of these [hearsay] statements as trial counsel for Appellant specifically objected to the admission of these statements prior to the interview tape being played for the jury, and the objection was the subject of a hearing in chambers which was ultimately overruled by the trial court.  Further, trial counsel renewed his objection at the start of the tape being played.
>
> Additionally, . . . the trial court gave a lengthy instruction of a limiting nature regarding the statements made by Detective Conkel during the interview.  Thus, as the trial court provided an instruction to the jury prior to deliberations, there was no need for counsel to request a further instruction. As such, we reject this portion of Appellant's argument. . . .

(*Id.*, p. 61, at PAGEID#: 265).

The record supports the Ohio Court of Appeals' assessment of petitioner's claim.  First, as the state court pointed out, petitioner's counsel expressly objected to the admission of petitioner's videotaped police interview containing the hearsay statements.  (*See id.*, Trial Tr. 246-47, 253, at PAGEID#: 612-13, 619).  Therefore, although counsel's objection to the introduction of the videotaped interview was overruled by the trial court, it was reasonable for the Ohio Court of Appeals to find that petitioner could not prevail on any claim that his counsel was ineffective with respect to the admission of any hearsay statements by the co-defendants that were contained in that recording.

Second, to the extent that petitioner has alleged his counsel should have also requested that a curative instruction be given to ensure that the jury would not consider the co-defendants' hearsay statements contained in the recording as evidence of petitioner's guilt, the trial court did

---

[9] The Ohio Court of Appeals' adjudication of petitioner's Confrontation Clause claim will be discussed herein when the claims alleged in Grounds One and Five of the petition are addressed.

56

give the following instruction to the jury before it retired to deliberate:

> You have heard a recorded interview . . . of the Defendant in this case. You are instructed that statements made by the Defendant in the interview are to be considered by you as evidence in this case, and may be used by you to determine one way or another the facts of this case. . . . However, the State is not offering the statements made by the officer to prove the truth of the matter asserted in them. Instead, the statements, opinions, and questions of the officer are designed to elicit a response from the Defendant, and are not being offered to prove that the events of March 7th, 2012, occurred as stated by the officer in the interview. Instead, the officer is merely attempting to convince the Defendant to express his belief as to how the events of that day took place.
>
> The statements by the officer are used to set the context of the Defendant[']s statements and are to be considered only in relation to Defendant's responses. Officers are permitted to use a variety of question tactics when interviewing Defendants and witnesses, but the . . . interrogatory statements are for the purpose of eliciting responses, and are not to be considered to prove a mat[t]er stated therein.
>
> *The only statements in the interview that are being offered as evidence are the statements made by the Defendant*. . . .

(*Id.*, Trial Tr. 528, at PAGEID#: 900) (emphasis added).

Given the court's instruction limiting the jury's consideration of statements made by Detective Conkel during the police interview, it was not unreasonable for the Ohio Court of Appeals to conclude that any further instruction on the issue was not necessary and that petitioner's counsel, therefore, did not perform outside the wide range of reasonable professional assistance in failing to make a request for such an instruction. Accordingly, under the doubly deferential standard of review required to be applied by this Court, petitioner has not demonstrated that he is entitled to habeas relief based on the merits of that particular claim of ineffectiveness.

### 4. Failure To Object To Improper Opinion Testimony

Petitioner has claimed that his trial counsel was ineffective for failing to object to the opinion testimony proffered by State witness Roman Brandau, "an expert Fire Investigator,"

regarding the victim's head injury.  (*See* Doc. 12, Ex. 11, p. 27, at PAGEID#: 158; *see also id.*, Ex. 14, pp. 61-62, at PAGEID#: 265-66).  Petitioner specifically contends that his counsel should have objected to Brandau's testimony that the "size and shape characteristics" of the "large gash wound" on the back of the victim's head were that of a "hatchet" or "small ax," which made it "pretty obvious" to him that the injury was "not fire related at all."  (*See id.*, Trial Tr. 198-99, at PAGEID#: 558-59).

The Ohio Court of Appeals rejected petitioner's claim of ineffectiveness because petitioner had not shown under the prejudice prong of the *Strickland* test that the result of the trial would "reasonably likely have been different," *Strickland,* 466 U.S. at 695, if an objection to Brandau's testimony had been lodged and sustained.  (*See id.*, Ex. 14, pp. 62-63, at PAGEID#: 266-67).  In so ruling, the court pointed out that Dr. Bryan Casto, "the deputy coroner and forensic pathologist who performed the autopsy of the victim," was qualified as an expert and testified at trial that there were "multiple chop style wounds" to the victim's head, which were "created" by an "instrument that has a cutting edge and is heavy, . . . [l]ike a hatchet or something like that."  (*See id.*, p. 62, at PAGEID#: 266; *see also* Doc. 12, Trial Tr. 375-76, 378, at PAGEID#: 741-42, 744).  Casto further testified that the wounds were "designated as chop wounds rather than just a simple stab" because the "cuts of the scalp [were] accompanied by underlying crushing of the skull."  (Doc. 12, Trial Tr. 378, at PAGEID#: 744).

Given Castro's expert opinion testimony that was properly introduced at trial regarding the weapon that was used to cause the "chop wounds" to the victim's head, it was reasonable for the Ohio Court of Appeals to conclude that the result of the proceeding would not have been different if Brandau's testimony to the same effect had been objected to and excluded from the jury's consideration.  Accordingly, the Ohio Court of Appeals' adjudication of the issue did not

involve an unreasonable application of *Strickland*.

**5. Failure To Object To Trial Court's Immigration Comments**

Plaintiff has alleged that his counsel was ineffective for failing to object to the following comment that was made by the trial court when it sustained the State's objection to defense counsel's attempt to cross-examine Detective Conkel about the citizenship status of the victim: "I'm going to instruct the jury at this time that citizenship status has no bearing on this case.  I don't know whether he's a citizen or not, but everybody has a right to live."  (*See* Doc. 12, Ex. 11, p. 28, at PAGEID#: 159; *see also id.*, Ex. 14, p. 63, at PAGEID#: 267; Trial Tr. 316, at PAGEID#: 682).

The Ohio Court of Appeals rejected petitioner's claim of ineffectiveness given its determination that the comment "did not merit a challenge based upon judicial bias or partiality," particularly since the trial judge expressly instructed the jury to disregard anything that he may have said or done during the course of the trial that could be considered as indicating his "view on the facts" and also stated that he did "not have the right and d[id] not desire to invade the province of the jury by indicating in any way a preference between the State and the Defendant." (*See id.*, Ex. 14, p. 63, at PAGEID#: 267; *see also id.*, Trial Tr. 546, at PAGEID#: 918).  The undersigned agrees with the state court's determination.  As discussed above in addressing the corollary claim of judicial bias alleged in Ground Four of the petition, petitioner is unable to prevail on any claim that the trial court's general comment about everybody's "right to live," which was made to explain why the victim's citizenship status was an irrelevant issue, prejudicially affected the outcome of the trial.  *See supra* p. 27.  Therefore, petitioner has not demonstrated as required by *Strickland* that the result of the trial would "reasonably likely have been different," *Strickland,* 466 U.S. at 695, if the comment had been excluded from the jury's

consideration upon objection by counsel.

**F. Petitioner Has Not Demonstrated That He Is Entitled To Habeas Relief Based On The Claims In Grounds One And Five Challenging The Admission Of The Co-Defendants' Hearsay Statements**

In Ground Five of the petition, petitioner challenges the admission of co-defendant Raymond Linkous's and Thomas Steinhauer's hearsay statements, which allegedly occurred during Detective Conkel's trial testimony. (Doc. 1, at PAGEID#: 11; *see also* Doc. 12, Ex. 11, pp. 23-24, at PAGEID#: 154-55). In Ground One of the petition, petitioner contends that the Ohio Court of Appeals did not consider Ohio's "standards regarding harmless error review" when ruling on the claim of error alleged in Ground Five on direct appeal. (Doc. 1, at PAGEID#: 7).

At trial, petitioner's counsel objected to the admission of the videotaped police interview of petitioner by Detective Conkel on the ground that it contained statements by Conkel "reciting what she [was] told by the co-defendants." (*See* Doc. 12, Trial Tr. 246, at PAGEID#: 612). Counsel argued that Conkel's statements about "what [the co-defendants] told her" constituted impermissible hearsay evidence, which violated petitioner's right under the Confrontation Clause to cross-examine the two witnesses who did not testify at the trial. (*See id.*, Trial Tr. 246-47, at PAGEID#: 612-13). The trial court overruled the objection after the State countered the defense's contention with the argument that Conkel's statements were merely "attempts to elicit information from the Defendant, and as such, they're not hearsay." (*Id.*, Trial Tr. 247, at PAGEID#: 613). At the close of the trial, the trial court instructed the jury in accordance with the State's argument that (1) only statements made by petitioner in the videotaped interview could be considered as evidence; and (2) any statements made by Conkel during the interview could not be considered "to prove the truth of the matter asserted in them," but rather could only

60

be considered as providing "the context of the [petitioner's] statements" and "in relation to [petitioner's] responses," because they were offered to elicit a response from petitioner, not to prove that the events occurred as stated by Conkel in the interview. (*See id.*, Trial Tr. 528, at PAGEID#: 900).

On direct appeal, petitioner contended that the trial court violated his constitutional right to confront the witnesses against him by admitting the videotaped interview into evidence, as well as by allowing Conkel to generally testify at trial about what she learned during the course of her investigation "as a means of introducing hearsay." (*See* Doc. 12, Ex. 11, pp. 23-24, at PAGEID#: 154-55). The Ohio Court of Appeals, which was the last state court to issue a reasoned decision addressing petitioner's claim, overruled the assignment of error in a majority decision, in which another member of the three-judge appellate panel concurred. (*See* Doc. 12, Ex. 14, pp. 39-48, 77-81, at PAGEID#: 243-52, 281-85). In the majority decision, the court reasoned in pertinent part as follows in ruling on the issues raised by petitioner:

> The Sixth Amendment to the United States Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." The Supreme Court of the United States has "held that this bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). . . . Before its admission, "[w]here testimonial evidence is at issue *** the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination. *Crawford*, 541 U.S. at 68.
>
> The threshold inquiry is whether the challenged out-of-court statements were testimonial in nature and needed to be tested by confrontation. . . . Statements are "testimonial when the circumstances objectively indicate that there is no *** ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). . . . Here, there was no ongoing emergency, but rather, the circumstances indicate that the purpose of the interrogation was to prove past events relevant for later prosecution. As such, we find the statements at issue to be testimonial.

Confrontation Clause violations, however, are subject to harmless error analysis…. *United States v. Summers*, 414 F.3d 1287, 1303 (10th Cir. 2005). "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78; citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, the question of whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. *Conway* at ¶ 78. Rather, it is a question of whether there is a reasonable possibility that the evidence complained of might have contributed to the convictions. Id.; citing *Chapman* at 23.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is inadmissible at trial, unless it falls under an exception to the Rules of Evidence. Evid.R. 802. Evid.R. 801(D)(2)(a) provides that a statement is "not hearsay" if, "The statement is offered against a party and is *** the party's own statement ***." The statements at issue herein are not Appellant's own statements, but rather are statements purportedly made by Appellant's co-defendants to law enforcement during the investigation of the homicide of Felipe Lopez.

Appellant does not cite to the specific statements made by Conkel, but rather refers to a span of nearly fifty pages in the trial transcript in which he argues these statements are contained. As Appellant does not set forth and argue each statement separately, neither do we. However, after reviewing the transcript we identified several statements by Conkel that incorporate statements purportedly made by Linkous and Steinhauer. Implicit in the State's argument that some of the statements weren't even actually made by the co-defendants, is the fact that some of them ostensibly were. Assuming that any of these statements were, in fact, made by the co-defendants, we find that the trial court should not have allowed into evidence the portions of the tape where Detective Conkel stated that Appellant's co-defendants implicated him in the crimes.

Prior to interrogating Appellant, it appears that Detective Conkel interviewed Appellant's co-defendants, Linkous and Steinhauer, about Felipe Lopez's death. During Appellant's recorded interview, Detective Conkel made multiple references to statements made by Appellant's co-defendants indicating Appellant was involved in the crimes, specifically suggesting that Linkous and Steinhauer said Appellant struck the victim with a hatchet. Neither Linkous nor Steinhauer testified at Appellant's trial and thus were not subject to cross-examination. As such, these testimonial statements are barred by the Confrontation Clause and their admission violated Appellant's Sixth Amendment rights. See *Crawford* and *Davis*, supra. Although the trial court did provide a limiting instruction to the jury informing the jury that Conkel's statements were not to be considered as evidence, were not offered to prove the truth of the matter asserted, and were

simply designed to elicit responses from Appellant, we find that the instruction was insufficient to cure this constitutional violation.

It has been observed that "[m]ost testimonial statements are too damaging for a lay juror to separate and/or ignore." *State v. Edwards*, 11th Dist. Lake No. 2012-L-034, 2013-Ohio-1290, ¶ 38; citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). "'The rationale of *Bruton* was that the introduction of a potentially unreliable confession of one defendant which implicates another defendant without being subject to cross-examination deprives the latter defendant of his right to confrontation guaranteed by the Sixth Amendment.'" *Edwards* at ¶ 38; quoting *United States v. Fleming*, 594 F.2d 598, 602 (7th Cir. 1979). The *Bruton* rule also applies to statements of co-defendants that are not confessions. *State v. Moritz*, 63 Ohio St.2d 150, 155, 407 N.E.2d 1268 (1980).

However, "[c]ases following *Bruton* have established that the error may be harmless.". . . As such, *Bruton* violations are subject to harmless error review. See *State v. Burney*, 10th Dist. No. 06AP-990, 2007-Ohio-7137, ¶ 53; citing *Harrington v. California*, 395 U.S. 250, 252-54, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

> "'The mere finding of a violation of the *Bruton* rule in the course of the trial *** does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission [or statements] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error. (***)'" *Moritz* at 156; citing *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

Based on the facts of this case, the limiting instruction alone was not enough to cure the *Bruton* violation because the jury had already heard the testimonial statements of Detective Conkel that Appellant's co-defendants had implicated Appellant in the crimes resulting in the death of Felipe Lopez. Although such testimonial statements may have been too damaging for a lay juror to separate and/or ignore, we are mindful that *Bruton* violations are sometimes harmless error. Here, we conclude the *Bruton* violation was harmless error and did not prejudice Appellant as there was overwhelming evidence of guilt. . . . [W]e have … determined that Appellant's convictions were not against the manifest weight of the evidence and were supported by sufficient evidence. We further note that in reaching that decision, we were careful to only consider evidence properly admitted at trial, and did not consider the statements complained of under this assignment of error. Thus, the trial court's error was harmless beyond a reasonable doubt.

Finally, we address Appellant's argument that Detective Conkel was improperly permitted to testify generally about the results of the investigation. . . .  Initially we note that Appellant did not object to this general testimony by Conkel during trial.  Thus, it must be reviewed under a plain error analysis. . . .

A review of the record reveals that prior to the interview tape being played for the jury, Conkel was asked to recite a summary of her investigation.  After reviewing the transcript, it appears Conkel's testimony served to illustrate and explain the steps taken during the course of her investigation, leading up to the point in which Appellant was interrogated.  There were a few times during that recitation that Conkel began to include statements by Appellant's co-defendants, however, objections were promptly made and Conkel was re-directed in giving her testimony.  "[I]t is well-settled that statements offered by police officers to explain their conduct while investigating a crime are not hearsay because they are not offered for their truth, but rather, are offered as an explanation of the process of investigation.". . .  Thus, we find no error, let alone plain error, related to the admission of these statements.

(*Id.*, pp. 39-48, at PAGEID#: 243-52) (some Ohio case citations omitted).

The concurring judge agreed with the majority's holding that the trial court "erred in admitting the hearsay/testimonial statements of [petitioner's] co-defendants," which were contained in the recording of petitioner's police interview that was played for the jury.  (*See id.*, p. 77, at PAGEID#: 281).  The judge then provided the following statement relaying his reasons for finding that the error was harmless beyond a reasonable doubt:[10]

First, the remaining evidence standing alone constitutes overwhelming proof of Gerald's guilt.  This evidence includes:  (1) the testimony of Kelly Lopez, the wife of the decedent, that the day the crimes occurred, she saw Gerald with Lopez and that Lopez told her that he was leaving with Gerald, Steinhauer, and Linkous; (2) Detective Conkel's testimony, admitted without objection, that her investigation disclosed that the defendants had planned to attack Lopez and brought weapons with them, that they all left in a truck with Lopez, that Steinhauer stabbed Lopez, that Gerald hit Lopez in the head with a hatchet, that

_____

[10] A third member of the appellate panel, who had dissented from the majority on the issue of whether petitioner's counsel was ineffective for failing to seek the suppression of statements made by petitioner in his police interview after he invoked his right to counsel, disagreed with the determination that the alleged error was harmless and would have sustained the assignment of error.  (*See* Doc. 12, Ex. 14, pp. 82-92, at PAGEID#: 286-96).  It was the dissent's position that "if we do not consider the testimony of Detective Conkel where she quotes [petitioner's] co-defendants in violation of the Confrontation Clause; . . . and if [petitioner's] statement is not considered given his Fifth Amendment right to counsel, then . . . [i]t is difficult to find the errors were harmless in this case."  (*Id.*, pp. 91-92, at PAGEID#: 295-96).

64

they disposed of the hatchet and showered, and that Gerald changed his story several times[;] (3) the taped interview of Gerald by Detective Conkel, in which he changed his story, eventually admitting that he was present when Lopez was attacked and killed; (4) the testimony of BCI DNA expert Raymond Peoples, who testified that the hatchet submitted included Gerald's DNA on its handle; and (5) the testimony of Gerald's county jail cellmate Steven Drummond stating that Gerald told him that he hit Lopez in the back of his head with the hatchet and that the three defendants disarmed him, attacked him, and set the truck with his body in it on fire because they could not pay off a $5,000 drug debt.

Notably, in the absence of an objection by Gerald's trial counsel to Detective Conkel's testimony concerning the conclusions of her investigation, Gerald forfeited all but plain error on that issue. Insofar as Gerald argues in part . . . that this testimony constituted hearsay, his failure to object (which he fails to mention) forfeits the error. . . . And, because Gerald repeatedly reinitiated his conversation with Detective Conkel, the trial court did not err in admitting Gerald's statements to Detective Conkel. . . . Therefore, these statements contributed substantial proof of Gerald's guilt.

Finally, the jurors did not have to rely upon the improper testimonial evidence to find him guilty of the charged crimes; untainted evidence established his guilt as an accomplice. . . . Gerald admitted that he was in the truck with Lopez, Steinhauer, and Linkous, with weapons, for the purpose of at least intimidating Lopez. This confrontation ended with Lopez being stabbed with a knife, struck in the head with a hatchet, and burned alive in the truck. Gerald was present during the crimes and assisted in their preparation.

Consequently, I conclude there is no reasonable probability that the tainted evidence might have contributed to Gerald's convictions.

(*Id.*, pp. 78-81, at PAGEID#: 282-85).

As an initial matter, petitioner procedurally defaulted and has waived the sub-claim that was raised on direct appeal challenging Detective Conkel's general testimony about what she learned during the course of the investigation. Petitioner committed the procedural default by failing to object to that testimony when it was introduced at trial.[11] Ohio's contemporaneous objection rule is a firmly-established, adequate and independent state procedural rule, which

---

[11] It is noted that during Detective Conkel's general testimony, petitioner's counsel did object when Conkel began to refer to a statement made by a co-defendant in explaining the significance of an item discovered in the investigation. (*See* Doc. 12, Trial Tr. 251, at PAGEID#: 617). That objection was *sustained*. (*Id.*).

serves to foreclose federal habeas review when relied on by the state courts as a basis for

denying relief. *See, e.g., Goodwin v. Johnson,* 632 F.3d 301, 315 (6th Cir. 2011) (citing *Hinkle*

*v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001)); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir.

2005) (citing *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003)); *see also State v. Murphy*,

747 N.E.2d 765, 788 (Ohio 2001) (pointing out that Ohio's "waiver rule," which "requires that a

party make a contemporaneous objection to alleged trial error in order to preserve that error for

appellate review," is "of long standing" and "goes to the heart of the adversary system of

justice"). The Sixth Circuit has repeatedly held that plain-error review by the state appellate

court "constitutes enforcement of Ohio's contemporaneous objection rule." *See, e.g., Williams v.*

*Bagley,* 380 F.3d 932, 968-69 (6th Cir. 2004) (and Sixth Circuit cases cited therein); *see also*

*Goodwin*, 632 F.3d at 315.

In this case, the Ohio Court of Appeals clearly and expressly enforced the state

procedural bar to review when it concluded that because petitioner "did not object to th[e]

general testimony by Conkel during trial," that particular claim of error under the Confrontation

Clause "must be reviewed under a plain error analysis." (*See* Doc. 12, Ex. 14, p. 46, at

PAGEID#: 250).[12] Under well-settled Sixth Circuit precedents, the state appellate court's plain-

error review did "not constitute a waiver of state procedural default rules." *See, e.g., Seymour v.*

*Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th

Cir. 1989)); *see also Goodwin*, 632 F.3d at 315. Therefore, the claim is waived unless petitioner

demonstrates cause for and prejudice from the alleged error or that a fundamental miscarriage of

justice will occur if the claim is not considered herein. *See Hoffner v. Bradshaw*, 622 F.3d 487,

---

[12] The concurring judge on the three-judge appellate panel also found that petitioner had forfeited the claim of error by failing to object to Conkel's general testimony at trial. (*See* Doc. 12, Ex. 14, p. 79, at PAGEID#: 283). The dissenting judge, who was silent on the issue, apparently agreed with the majority's disposition of that particular sub-claim. (*See id.*, pp. 82-92, at PAGEID#: 286-96).

497 (6th Cir. 2010) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Petitioner has not demonstrated that failure to consider the defaulted sub-claim will result in a "fundamental miscarriage of justice," or in other words, that the alleged error "probably resulted in the conviction of one who is actually innocent." *See Murray v. Carrier,* 477 U.S. 478, 495-96 (1986); *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995). In addition, petitioner is unable to prevail on any argument that his trial counsel's failure to object to the challenged testimony constitutes cause for his default, because the claim of ineffectiveness was itself defaulted by petitioner in the state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 450-54 (2000). Although petitioner asserted a number of claims on direct appeal attacking his trial counsel's performance, none of those claims was based on counsel's failure to object to Conkel's general trial testimony about the investigation.[13] Moreover, although petitioner also filed an application to reopen the direct appeal based on allegations of ineffective assistance by his appellate counsel, he has never contended (either in the reopening proceeding or in the instant habeas corpus action) that his appellate counsel was ineffective for failing to allege as an additional example of trial counsel's ineffectiveness that counsel should have objected to Conkel's testimony as a violation of the Confrontation Clause. Therefore, petitioner's claim challenging Conkel's general trial testimony is barred from review from this Court.

With respect to petitioner's remaining claim stemming from the admission of petitioner's videotaped police interview, although the three judges on the appellate court panel all agreed that the Confrontation Clause was violated, a strong argument can be made that the Confrontation

---

[13] It is noted that petitioner did claim on direct appeal that his trial counsel was ineffective for failing to request a curative instruction on hearsay. (*See* Doc. 12, Ex. 11, p. 27, at PAGEID#: 158). The claim was generally stated and did not contain any allegation even remotely suggesting that it encompassed counsel's failure to object to Detective Conkel's general trial testimony about what she learned during the investigation. (*See id.*). The Ohio Court of Appeals, therefore, considered that particular claim of ineffective assistance as only involving counsel's failure to request a curative instruction "in regards to the hearsay statements attributable to [petitioner's] co-defendants that were admitted into evidence," over counsel's objection, by way of "the videotape of [petitioner's] interview that was played for the jury." (*See id.*, Ex. 14, p. 60, at PAGEID#: 264).

Clause was not implicated in this case because the co-defendants' testimonial statements contained in the recording were offered solely for a non-hearsay purpose. As the Supreme Court noted in *Crawford v. Washington*, 541 U.S. 36 (2004), the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9; *see also Tennessee v. Street*, 471 U.S. 409, 414 (1985) (holding that the "*nonhearsay* aspect" of [a co-defendant's] confession—not to prove what happened at the murder scene but to prove what happened when [the defendant] confessed— raises no Confrontation Clause concerns") (emphasis in original). The Ohio Court of Appeals did not address whether the statements at issue were offered for the truth of the matter asserted,[14] even though it is clear from the record that the trial court overruled petitioner's objection to the admission of the recorded police interview on the ground that the co-defendants' out-of-court statements relayed therein were not offered for their truth, *i.e.*, "to prove that the events occurred as stated by Conkel in the interview," but rather "to elicit a response from petitioner." (*See* Doc. 12, Trial Tr. 247, 528, at PAGEID#: 613, 900). Other courts in analogous cases have found, as the trial court determined in this case, that the admission of such evidence is permissible under the Confrontation Clause. *See, e.g., United States v. Whittle*, __ F. Supp.3d __, No. 3:13cv170, 2016 WL 7015674, at *2-5 (W.D. Ky. Nov. 29, 2016) (and numerous cases cited therein) (holding no Confrontation Clause issues were raised by the admission of the entire recording of the defendant's police interview in which the detective relayed to the defendant statements made by his co-defendant, because the co-defendant's out-of-court testimonial statements "were introduced to provide context, generate admissions from [the defendant], and show the consistency of [the defendant's] responses, not to prove the truth of the matters asserted"),

---

[14] Instead, the court skimmed over the issue and found that the co-defendants' statements were hearsay because they did not involve petitioner's "own statements" under an exception to the hearsay rule. (*See* Doc. 12, Ex. 14, p. 42, at PAGEID#: 246).

*appeal filed*, No. 16-6821 (6th Cir. Dec. 19, 2016); *Restivo v. Lattimore*, No. SA CV 08-1028-

MMM(E), 2010 WL 5563893, at *9-11 (C.D. Cal. Sept. 7, 2010) (Report & Recommendation)

(and numerous cases cited therein) (rejecting the habeas petitioner's claim that the trial court

erred in admitting a non-testifying co-conspirator's statements relayed by the detective in a

police interview that was played for the jury because those statements "were not introduced for

the truth of the matter asserted," but rather "for the sole purpose of giving context to Petitioner's

interview statements"), *adopted*, 2010 WL 5564219 (C.D. Cal. Dec. 31, 2010).  *Cf. Woods v.

Wolfe*, No. 2:07cv269, 2008 WL 2371401, at *1, *9-14 (S.D. Ohio June 10, 2008) (and cases

cited therein) (rejecting a habeas petitioner's claim challenging the admission of a recording

containing the detective's statement to the petitioner that his potential alibi witness had failed to

corroborate the alibi because the witness's out-of-court statements "were not offered for their

truth, but to show why petitioner changed his story to police").

      In this case, measures were taken to ensure that the jury would not improperly consider

the co-defendants' statements as proof that the events occurred as stated by Conkel in the

interview.  Immediately after the recording of the police interview was played at trial, Conkel

testified on direct examination that the statements she made in the interview were "an interview

technique," designed "to elicit responses" from petitioner, and that "[n]ot all the things . . . [she]

said to him were true."  (Doc. 12, Trial Tr. 299-300, at PAGEID#: 665-66).  Conkel also

affirmed that "the important part of the interview is what [petitioner] said."  (*Id.*, Trial Tr. 300, at

PAGEID#: 666).  Moreover, in closing arguments, the prosecutor did not refer to any of the co-

defendants' statements or anything else that was said by Conkel in the videotaped police

interview in setting forth the evidence that established petitioner's guilt.  (*See id.*, Trial Tr. 484-

98, 511-24, PAGEID#: 856-70, 883-96).  Finally, at the close of the trial, the trial court gave a

lengthy instruction to the jury explaining that only the statements made by the petitioner in the interview could be considered as evidence because Detective Conkel's statements were not "offered to prove the truth of the matter asserted in them," but rather were "designed to elicit a response" from petitioner as "the officer [was] merely attempting to convince [petitioner] to express his belief as to how the events of that day took place." (*See id.*, Trial Tr. 528, at PAGEID#: 900).  The court further instructed that because the "statements by the officer [were] "used to set the context of [petitioner's] statements," they were "to be considered only in relation to [petitioner's] responses" and were "not to be considered to prove a mat[t]er stated therein." (*See id.*).  In light of this record, the undersigned is persuaded that the court's instructions, which not only directed the jury's attention to the non-hearsay purpose of Conkel's statements, but also expressly provided that only petitioner's statements could be considered as evidence, was adequate to limit "the jury's use of [the co-defendants' statements] in a manner consistent with the Confrontation Clause." *Cf. Street*, 471 U.S. at 414-17 (holding that the trial court's instruction to the jury "not to consider the truthfulness of [a co-defendant's] statement in any way whatsoever" was "the appropriate way to limit the jury's use of that evidence" based on the circumstances presented in the case, which included "the prosecutor's questions and closing argument" that directed the jury's attention to the "legitimate, nonhearsay purpose" for introducing that statement).

In any event, even assuming, as the Ohio Court of Appeals concluded, that the trial court erred in admitting the entire videotape into evidence, the majority's determination that the error was harmless must be upheld under the harmless-error standard that this Court is required to apply on federal habeas review of petitioner's state conviction.  As the Ohio Court of Appeals recognized, "Confrontation Clause errors are subject to harmless-error analysis." *Gover v.*

*Perry*, 698 F.3d 295, 302 (6th Cir. 2012) (quoting *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir.

2007)); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Despite petitioner's

contention in Ground One that the Ohio Court of Appeals applied the wrong harmless-error

standard in evaluating his Confrontation Clause claim,[15] this Court's harmless-error review is

limited. On federal habeas review, the Court must apply the harmless-error standard established

by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "regardless of the

harmless-error standard applied by the state court – or even if the state court failed to undertake

harmless error review." *Brown v. Warden, Ross Corr. Inst.*, No. 2:15cv1374, 2016 WL

6277860, at *7 (S.D. Ohio Oct. 27, 2016) (Report & Recommendation) (citing *Fry v. Pliler*, 551

U.S. 112, 121-22 (2007), wherein the Supreme Court held that the *Brecht* harmless-error

standard applies on federal habeas review "whether or not the state appellate court recognized

the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt'

standard set forth in *Chapman* [*v. California*, 386 U.S. 18 (1967)]"), *adopted*, 2016 WL 6876602

(S.D. Ohio Nov. 22, 2016); *see also Gover*, 698 F.3d at 302. Under the *Brecht* standard, "an

error requires reversal only if it 'had substantial and injurious effect or influence in determining

the jury's verdict.'" *Gover*, 698 F.3d at 302 (quoting *Brecht*, 507 U.S. at 631).

Here, even the dissenting judge on the state appellate court panel conceded that "a

reasonable person could find" there was "overwhelming proof" of petitioner's guilt based on

petitioner's own incriminatory statements in his police interview, wherein he (1) admitted to

Detective Conkel that he was present "in the truck with the group" and "witnessed Steinhauer

---

[15] To the extent petitioner alleges in Ground One of the petition that he is entitled to federal habeas relief because the Ohio Court of Appeals applied the wrong harmless-error standard under Ohio law, he has failed to state a cognizable ground for relief. This Court lacks jurisdiction to consider the state-law issue. *See* 28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *see also Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").

stab Lopez and Linkous set fire to the truck"; and (2) "specifically denied any knowledge of the hatchet and denied hitting Lopez with the hatchet, although through Raymond Peoples' testimony, [petitioner's] DNA was on the handle of the hatchet."  (*See* Doc. 12, Ex. 14, pp. 83-84, at PAGEID#: 287-88).  In addition, as discussed in greater detail below with respect to petitioner's claim challenging the sufficiency of the evidence, other substantial evidence was introduced at trial to establish petitioner's guilt in this case.  Such evidence included Steven Drummond's testimony relaying petitioner's detailed admission to him of his participation in the victim's murder, including his wielding of the hatchet that split the victim's head "like a watermelon"; Kelly Lopez's testimony that on the day her husband was killed, he left their home with petitioner, Steninhauer and Linkous in the truck that was later found torched with his body inside of it; Loren Oakes' eyewitness testimony that he saw three people—one person in the driver seat of the truck and two people in the car behind the truck—as the two vehicles traveled onto Junior Furnace Powellsville Road and pulled over to the side of the road right before the truck was torched; and Detective Conkel's testimony regarding her observations of Linkous and petitioner when she first encountered the two men after seeing Linkous leaving petitioner's trailer on the night of the murder.  (*See id.*, Trial Tr. 146-51, 165-69, 227-28, 231-32, 448-56, at PAGEID#: 506-11, 525-29, 593-94, 597-98, 598, 820-28).  Upon review of the entire record, which includes not only the properly admitted evidence of guilt, but also the court's lengthy limiting instruction to the jury about the evidence subject to consideration in the videotaped interview, the undersigned finds that the alleged error in admitting the non-testifying co-defendants' statements that were relayed by Detective Conkel in the recorded police interview did not have a substantial impact or influence on the jury's verdict in this case.

Accordingly, in sum, the Court concludes that because petitioner did not object at trial to

Detective Conkel's general trial testimony summarizing what she learned during the course of her investigation of the murder, petitioner procedurally defaulted and has waived any claim challenging that testimony under the Confrontation Clause.  In addition, petitioner has not demonstrated he is entitled to habeas relief based on his claim challenging the admission of the recording of his police interview because (1) the co-defendants' statements contained in that recording were offered for a non-hearsay purpose, to which both the prosecutor and the trial court specifically directed and limited the jury's attention; and (2) in any event, any error in allowing those statements into evidence was harmless under the *Brecht* standard of review that must be applied in this federal habeas proceeding.

### G.  Petitioner Is Not Entitled To Habeas Relief Based On His Claim In Ground Three Challenging The Weight And Sufficiency Of The Evidence

In Ground Three of the petition, petitioner contends that he is entitled to habeas relief because his convictions for aggravated murder, murder, kidnapping, aggravated arson, arson and tampering with the evidence are both against the manifest weight of the evidence and not supported by sufficient evidence.  (Doc. 1, at PAGEID#: 9).

Respondent contends in the return of writ that petitioner's manifest-weight-of-the-evidence claim is not cognizable in this federal habeas proceeding and that petitioner's sufficiency-of-evidence claim is subject to dismissal because it "is improperly pled and is procedurally defaulted."  (Doc. 13, p. 23, at PAGEID#: 952).  The undersigned agrees that this Court lacks jurisdiction to consider petitioner's claim challenging the weight of the evidence because it raises a state-law issue that does not implicate federal constitutional concerns.  *See* 28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. 1, 5-6 (2010); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *Jackson v. Warden, Chillicothe Corr. Inst.,* No. 1:14cv128, 2015 WL 4481517, at *1, *16 (S.D. Ohio July 22, 2015) (Dlott, J.;

Wehrman, M.J.) (and cases cited therein); *see also Richardson v. Smith,* No. 3:11cv1217, 2012 WL 5903986, at *17 (N.D. Ohio Oct. 30, 2012) (Report & Recommendation)  (quoting *Tibbs v. Florida*, 457 U.S. 31, 41-47 (1982)) ("claim that a conviction is against the manifest weight of the evidence is not cognizable in federal habeas corpus review" because it is "derived from purely state law whereby the state appellate court sits as a 'thirteenth juror and disagrees with fact finder's resolution of conflicting testimony' and finds that the fact finder 'clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered'"), *adopted*, 2012 WL 5903896 (N.D. Ohio Nov. 26, 2012).  *Cf. Nash v. Eberlin*, 258 F. App'x 761, 765 & n.4 (6th Cir. 2007) (recognizing that "a manifest-weight-of-the-evidence argument is a state-law argument").

However, the undersigned finds that, contrary to respondent's contention, petitioner's sufficiency-of-evidence claim, which presents an issue of due process, is subject to review on the merits.  First, because the claim alleged in Ground Three is identical to the assignment of error that was presented on direct appeal to the Ohio Court of Appeals, the Court presumes that the claim is based on the same specific factual allegations that were asserted in the substance of petitioner's state appellate brief.  Second, as discussed above in addressing respondent's procedural-default argument as it pertains to claims alleged in Ground Six of the petition, *see supra* p. 41, the undersigned will assume in petitioner's favor that petitioner did not default the sufficiency-of-evidence claim that was raised to and considered by the Ohio Court of Appeals even though he only generally referred to the issue in his memorandum in support of jurisdiction on further appeal to the Ohio Supreme Court.  Although the question is admittedly a close one, an argument can be made that petitioner's reference in his third proposition of law to "issues . . . regarding the . . . sufficiency of the evidence against him" implicitly included the specific issues

74

that were addressed by the Ohio Court of Appeals in the challenged direct appeal decision, which was also included as an attachment to petitioner's jurisdictional memorandum.  (*See* Doc. 12, Ex. 16).

In this case, the Ohio Court of Appeals was the only state court to address petitioner's sufficiency-of-evidence claim on the merits.  Noting that "a conclusion that a conviction is supported by the weight of the evidence will also determine the issue of sufficiency," the court considered petitioner's claim under the state-law standard governing manifest-weight-of-evidence claims.  (*See id.*, Ex. 14, p. 18, at PAGEID#: 222).  The court overruled the assignment of error, reasoning in pertinent part as follows:

### Counts One, Two, Three, Four and Five:  Aggravated Murder, Aggravated Murder, Murder, Aggravated Arson, Arson

Appellant was charged and convicted of two counts of aggravated murder, murder, aggravated arson and arson and although he was indicted as a principal offender, the State pursued a complicity theory at trial.  R.C. 2903.01(A) and (B) set forth the essential elements of aggravated murder as charged in counts one and two of Appellant's indictment:

"(A) No person shall purposely, and with prior calculation and design, cause the death of another. . . .

(B) No person shall purposely cause the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, . . . *aggravated arson* [or] *arson*. . . ."
(Emphasis added).

Here, the indictment with respect to count two, aggravated murder in violation of R.C. 2903.01(B), specified predicate offenses of aggravated arson and arson.

Appellant was also charged and convicted of one count of murder.  R.C. 2903.02(B) sets forth the essential elements of murder as charged in count three of Appellant's indictment:

"(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and

that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

Here, the predicate offenses for the murder charge, as specified in the indictment, were "Felonious Assault and/or Aggravated Arson or Arson[.]"

Appellant was also charged and convicted of one count of aggravated arson and one count of arson.  R.C. 2909.02(A)(1) sets forth the essential elements of aggravated arson, as charged in count four of Appellant's indictment:

> "(A) No person, by means of fire or explosion, shall knowingly do any of the following:
>
> (1) Create a substantial risk of serious physical harm to any person other than the offender[.]"

R.C. 2909.03(A)(1) sets forth the essential elements of arson, as charged in count five of Appellant's indictment:

> "(A) No person, by means of fire or explosion, shall knowingly do any of the following:
>
> (1) Cause, or create a substantial risk of, physical harm to any property of another without the other person's consent[.]"

The State's theory at trial was that Appellant and two others, Raymond Linkous and Thomas Steinhauer, aided and abetted and conspired with one another in murdering the victim, Felipe Lopez.  Thus, although Appellant was charged with the principal offenses of aggravated murder, murder, aggravated arson and arson, the State's theory at trial was one of complicity and the jury was instructed accordingly.

Under R.C. 2923.03(F), a defendant "may be convicted of [an] offense upon proof that he was complicit in its commission, even though the indictment 'is stated *** in terms of the principal offense' and does not mention complicity.". . .  R.C. 2923.03 defines complicity and provides, in relevant part, as follows:

> "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: ***
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code."

In order to support a conviction for complicity by aiding and abetting pursuant to

R.C. 2923.03(A)(2), it has been held that the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. . . .  The defendant's intent may be inferred from the circumstances surrounding the crime. . . .  Further, the defendant's "'[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'". . .

As such, we must consider the circumstances surrounding the victim's death as well as Appellant's presence, companionship and conduct before and after the victim's death to determine whether Appellant supported, assisted, encouraged, cooperated with, or advised the principals, in this case Steinhauer and Linkous, in the aggravated murder and murder of the victim, as well as the aggravated arson and arson that served as the predicate offenses, if we are to conclude Appellant was complicit under (A)(2) of the complicity statute.  We further note, however, that section (A)(3) of the complicity statute provides that complicity may be proven by demonstrating that Appellant conspired with others to commit the offenses, in violation of section 2923.01 of the Revised Code.

R.C. 2923.01 governs conspiracy, and in this case, conspiracy to commit aggravated murder and murder, per count ten of Appellant's indictment. Appellant was indicted and convicted of conspiracy to commit aggravated murder and murder and he does not challenge that conviction on appeal.  Thus, he has conceded that he conspired to commit the crimes of aggravated murder and murder, and implicit in that concession, aggravated arson and arson, by virtue of the fact that those were the predicate offenses for the aggravated murder and murder charges for which Appellant has conceded he conspired to commit.  Thus, by conceding his conspiracy conviction, he has also conceded to the (A)(3) prong of the complicity statute.  Having conceded to being complicit in these crimes, Appellant cannot now complain of being convicted as a principal offender of the crimes of aggravated murder, murder, aggravated arson and arson.

However, assuming Appellant has not waived his right to challenge these convictions based upon sufficiency and manifest weight grounds, we nevertheless conclude that there was ample evidence to support the verdict that Appellant was complicit in the killing of Felipe Lopez and that Appellant purposefully, and with prior calculation and design, caused the death of Felipe Lopez, and also that Appellant was complicit in purposefully causing Felipe Lopez'[s] death while committing or attempting to commit aggravated arson and arson.  By Appellant's own admissions during his interrogation and through the testimony of Steven Drummond, Appellant was in the truck with Lopez, Steinhauer and Linkous, with weapons, for the purpose of at least intimidating Lopez, and which ultimately resulted in Lopez being stabbed, struck with a hatchet and burned alive. Additionally, the State introduced evidence that the truck was destroyed, which was owned by Debra Conn, and that in trying to put the fire out, several people were put at risk, including Jeff Huffman and the fire department personnel who

responded to the blaze.

During his interrogation, Appellant admitted his presence 1) during the stabbing; 2) during the trip to Kentucky to dispose of evidence; 3) during the stop at the gas station; 4) during the burning of the victim and the truck. Further, although Appellant denied that he struck the victim with a hatchet and denied knowledge of a hatchet, Drummond's testimony contradicted Appellant's denial, and the evidence at trial indicated that Appellant's DNA was present on the handle of the hatchet, which confirmed the State's theory. Finally, after the commission of the crime, Linkous was found exiting Gerald's residence, where it was obvious Linkous had showered and shaved his singed hair.

In light of the foregoing, we find there was substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offenses of aggravated murder, murder, aggravated arson and arson had been established, and that Appellant and the others were in complicity by virtue of their presence, cooperation, companionship and conduct both before and after the victim's death. As such, the judgments of conviction on counts one, two, three, four and five are not against the manifest weight of the evidence. Further, . . . this conclusion necessarily means sufficient evidence supports his convictions.

### Counts Six, Seven and Eight

Appellant was charged and convicted of three counts of tampering with evidence. R.C. 2929.12(A)(1) sets forth the essential elements of tampering with evidence as charged in counts six, seven and eight of Appellant's indictment:

> "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
>
> (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

Appellant was convicted of three counts of tampering with evidence based upon the State's allegation that he 1) destroyed clothing and other personal items, with purpose to impair their availability as evidence; 2) destroyed and concealed cell phones, a knife and a hatchet, with purpose to impair their availability as evidence; and 3) destroyed a motor vehicle, with purpose to impair its availability as evidence.

The State presented evidence at trial that Appellant conspired with Linkous and Steinhauer in the commission of the aggravated murder of Lopez. The record contains evidence that Appellant was present and cooperated with those

individuals in killing Lopez, driving to Kentucky, where the murder weapons and the victim's cell phones were destroyed and concealed and ultimately recovered, and then driving back to Ohio, stopping at a gas station and then meeting at a location on Junior-Furnace Powellsville Road, where the truck containing Lopez'[s] severely injured body was set on fire and destroyed.  Appellant admitted to being present during the trip to Kentucky where the items were disposed of, and based upon his conduct and the facts in evidence we can infer his participation in the destruction and concealment of that evidence.  Further, despite Appellant's denial in the participation of setting the truck on fire, we can infer from his conduct his support, assistance and cooperation in setting the fire.

Finally, although Appellant denied that he destroyed the clothing he wore during the commission of the crimes, the presence of a burn pile at the Gerald and Linkous[] residence and the fact that their clothing was never recovered supports an inference that they burned their clothes.  This is bolstered by the fact that both Gerald and Linkous appeared to have just showered when law enforcement encountered them and Linkous had shaved his hair and had singe marks on his body.  Further, Steinhauer, who was found in a different location, one without a burn pile, had bagged his blood-saturated clothes up and handed them to law enforcement when they arrived.  Appellant's clothes were never recovered and we conclude that evidence supports an inference that they were burned in the burn pile.

At the time Appellant would have tampered with evidence, an official proceeding or investigation was not yet in progress; however, "'[w]hen an offender commits an unmistakable crime, the offender has constructive knowledge of an impending investigation of the crime committed.'". . .  Further, with respect to the element of the offense requiring purpose to impair the value or availability of the evidence in such a proceeding or investigation, "the offender does not have to actually impair the evidence's value or availability.  It is sufficient that the offender alters, destroys, conceals, or removes the item 'with purpose' to impair its value or availability.". . .  Thus, it makes no difference that the cell phones and murder weapons were ultimately recovered.

Here, the jury could logically conclude that the essential elements of tampering with evidence were proven with respect to counts six, seven and eight of Appellant's indictment.  As such, Appellant's convictions are not against the manifest weight of the evidence.  As set forth above, this conclusion necessarily means sufficient evidence supports his convictions. . . .

### Count Nine:  Kidnapping

Appellant was charged and convicted of one count of kidnapping.  R.C. 2905.01(A)(2) sets forth the essential elements of kidnapping as charged in count nine of Appellant's indictment:

"(A) No person, by force, threat, or deception, . . . by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: ***

(2) To facilitate the commission of any felony or flight thereafter[.]"

Appellant contends that the evidence at trial indicates that he left Lopez'[s] house in the bed of the truck and remained in the bed of the truck throughout the ordeal. He further argues that Lopez entered the truck voluntarily and there was no evidence introduced that Lopez was forced into the truck or that his liberty was restrained after he entered the truck.  The State contended at trial, and also on appeal, that Appellant and his co-defendants attacked Lopez at some point after they all left in the truck and then restrained Lopez's movement thereafter by transporting him over forty five miles to the location in which he was burned, unbeknownst to them, alive.

In *State v. Linkous*, 4th Dist. No. 12CA3517, 2013-Ohio-5853, a decision issued by this Court in connection with the appeal of one of Appellant's co-defendants, we reasoned as follows . . . with respect to the same argument related to the kidnapping conviction:

> "In *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-640[4], 858 N.E.2d 1144 (2006), the Ohio Supreme Court held that sufficient evidence supported a defendant's kidnapping conviction, even though the defendant mistakenly believed the victim was dead before he 'gagged and hogtied the victim' and concealed the victim's body in the basement.  In *Johnson*, the defendant was charged with aggravated murder and kidnapping of a thirteen-year old child.  On appeal, he asserted that sufficient evidence did not support his kidnapping conviction because the evidence showed th[at] he 'beat [the victim] to death' in the living room before he restrained the victim and moved his body to the basement. . . .  The defendant argued 'that he could not have kidnapped [the victim], because [the victim] died before [the defendant] hogtied him.'. . . In rejecting the defendant's argument, the court explained: '*** [T]he evidence does not support [the defendant's] contention that [the victim] had died before being restrained.  [The coroner] testified that [the victim] was still alive when [the defendant] tied his hands and feet, and this testimony supports the jury's finding that [the defendant] restrained [the victim] of his liberty.'. . ."

We determined that the facts in *Linkous* involved facts similar to *Johnson* in that the evidence indicated that the victim was not dead when the appellant and his accomplices restrained him. . . .  Based upon those facts, we determined in *Linkous* that "the evidence support[ed] the jury's finding that appellant and his

accomplices restrained the victim's liberty.". . .  We find the reasoning employed in both *Johnson* and *Linkous* to be applicable here where the State presented expert testimony that even though Lopez had sustained severe stab and chop wounds, he was still alive during the fire.  Thus, we conclude the evidence supports the jury's finding that Appellant and his accomplices restrained the victim's liberty.  Again, even if Appellant was not driving the truck and even if Appellant did not light the match, we have sustained his convictions for aggravated murder, murder and aggravated arson under a theory of complicity.  As such, we also conclude that his conviction for kidnapping is not against the manifest [weight] of the evidence and is supported by sufficient evidence.

(*Id.*, pp. 19-33, at PAGEID#: 223-37) (footnotes and some Ohio case citations omitted).

The well-settled standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979).  As the Supreme Court held in *Jackson*, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, *In Re Winship*, 397 U.S. 358, 363-64 (1970), "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt.  *Id.* at 326.  Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983).  It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence.  *Jackson*, 443 U.S. at 319.  Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or

otherwise substitute its opinion for that of the jury. *See id.* at 318-19 & n.13; *see also United States v. Fisher,* 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009)); *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)); *see also Fisher,* 648 F.3d at 450. Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Newman,* 543 F.3d at 796-97 (and Sixth Circuit cases cited therein).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, 567 F.3d at 205, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011); *Anderson v. Trombley*, 451 F. App'x 469, 474-75 (6th Cir. 2011). Therefore, as the Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner . . . is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

*Brown,* 567 F.3d at 205 (emphasis in original).

Applying the double-layer deferential standard to the case-at-hand, and upon review of the trial record, the undersigned concludes that the Ohio Court of Appeals' rejection of petitioner's assignment of error under the more stringent state-law standard governing manifest-weight-of-evidence claims is neither contrary to nor involves an unreasonable application of the *Jackson* standard for evaluating the sufficiency of the evidence.[16]

First, it was reasonable for the Ohio Court of Appeals to conclude that the evidence adduced at trial was more than sufficient for a rational juror to find that petitioner was guilty beyond a reasonable doubt of the aggravated murder, murder, aggravated arson and arson charges. As the state appellate court reasonably determined, a rational juror could infer that petitioner was guilty of participating as a principal actor or as one acting in complicity with Steinhauer and Linkous in the homicide and arson offenses from the following evidence that was introduced at trial: (1) petitioner's own admissions during his police interview that he was present with the co-defendants during the attack on the victim in the truck, during the drive to Kentucky where certain items were disposed of, when they next drove to a gas station where gas was obtained to set the truck on fire, and when the truck was set on fire with the victim's body inside of it;[17] (2) evidence of petitioner's DNA on the handle of the hatchet that was used to chop the victim's head, which contradicted petitioner's statements in his police interview that he had

_____

[16] *Cf. Jackson v. Warden, Chillicothe Corr. Inst.,* No. 1:14cv128, 2015 WL 4481517, at *16 (S.D. Ohio July 22, 2015) (Dlott, J.; Wehrman, M.J.) (pointing out that the state-law standard of review is "more stringent" given that a "finding that a conviction is supported by the weight of the evidence [under Ohio law] must necessarily include a finding of sufficiency").

[17] In addition, petitioner suggested, without admitting, in his police interview that the victim was killed because he, Steinhauer and Linkous believed it was their "only option" to prevent the victim, who was part of a "Mexican mafia," from killing them and their families. (*See* Doc. 12, Trial Tr. 281-86, at PAGEID#: 647-52). Detective Conkel testified further that after the interview, while she was escorting petitioner to the jail, petitioner asked her, "[W]hat if I could produce a gun?," and "What if I have the gun that Felipe had?" (*Id.*, Trial Tr. 307, at PAGEID#: 673). Petitioner then said to Conkel, "Let me make a phone call. My brother has the gun." (*Id.*). Petitioner made the phone call to his brother, who soon thereafter "showed up at [Conkel's] office with a 9 millimeter highpoint firearm" and turned it over to her. (*Id.*). The gun was lost, along with the murder weapons that were sent to BCI for DNA testing, at some point prior to petitioner's trial. (*See id.*, Trial Tr. 316, at PAGEID#: 682).

no knowledge of the weapon; (3) Steven Drummond's testimony that petitioner admitted in their conversations at the jail that he and the two co-defendants "had gotten together and gone out to [the victim's] house in a borrowed vehicle" to "try to back [the victim] off" because they owed him "a sum . . . of about $5,000.00 having to do with the purchase of drugs," that he brought a hatchet and another co-defendant brought a knife, that they disarmed the victim at some point, and that he was the "righteous right hand of God" who hit the victim "in the back of the head with [the] hatchet"; and (4) Detective Conkel's and another investigating officer's testimony regarding their observations of petitioner on the night of the homicide when they first encountered Linkous exiting petitioner's trailer after showering there, with "singed eyebrows," burns on his face and arm, and his head "freshly shaved," and next encountered petitioner in the trailer acting oddly and appearing like he too "had just got out of the shower" with "wet hair." (*See* Doc. 12, Trial Tr. 228, 231-32, 261-72, 319-20, 325, 355, 358-59, 439, 442, 450-56, at PAGEID#: 594, 597-98, 627-38, 685-86, 691, 721, 724-25, 805, 808, 822-28).

Petitioner is unable to prevail on any argument that Steven Drummond's testimony as a jailhouse informant lacks credibility or that other conflicting evidence was presented to establish his innocence.  As discussed above, in assessing the sufficiency of the evidence under the *Jackson* standard of review, the reviewing court is precluded from reweighing the evidence, reevaluating the credibility of witnesses or resolving conflicts in testimony, because those were issues for the jury to decide.  *See Jackson,* 443 U.S. at 318-19 & n.13; *see also Fisher,* 648 F.3d at 450 (citing *Brown,* 567 F.3d at 205).

Second, it was reasonable for the Ohio Court of Appeals to conclude that there was sufficient evidence presented at trial to support petitioner's conviction on the kidnapping count. As the state appellate court pointed out, evidence was introduced that the victim suffered

"inhalation thermal injuries" in addition to stab wounds to his torso and chop wounds to his head and thus was still alive when the truck was set on fire. (*See* Doc. 12, Trial Tr. 379-80, at PAGEID#: 745-46). A reasonable juror could infer from that evidence that, as the State had argued, the victim was restrained of his liberty when he was driven over a distance of several miles after he was stabbed and chopped in the head to the location where he was burned alive. In addition, the undersigned finds that even if the victim voluntarily entered the truck with the three accomplices when he left his home in the belief that they were traveling to a particular destination together, a rational juror could infer from the events that ensued that the victim was restrained of his liberty at some point in the journey by the three accomplices, who did not take the victim to the destination he had in mind and instead disarmed and attacked him.

Third, it was reasonable for the Ohio Court of Appeals to conclude that the evidence was sufficient for a rational juror to find that petitioner was guilty beyond a reasonable doubt of the three counts of tampering with evidence. As the state appellate court pointed out in its decision, the three charges stemmed from allegations that petitioner (1) destroyed "clothing and other personal items"; (2) destroyed and/or concealed "cell phones, a knife and a hatchet"; and (3) destroyed "a motor vehicle." (*See* Doc. 12, Ex. 1, Counts 6-8).

As discussed above, substantial evidence was presented at trial from which a rational juror could infer petitioner's guilt as an accomplice with Steinhauer and Linkous in the victim's homicide and the arson offenses. Such evidence included petitioner's own admissions in his police interview that he was present with the co-defendants when after attacking the victim, they drove to Kentucky to dispose of the victim's cell phones and the hatchet;[18] when they drove to a

---

[18] The knife used by Steinhauer in the attack was found in a bag recovered from Steinhauer when he was arrested the night of the crimes; the bag also contained a black leather coat, flannel shirt, "blue jeans with suspected blood," underwear, a pair of socks and "a fixed blade hunting knife." (*See* Doc. 12, Trial Tr. 204-09, at PAGEID#: 564-69).

gas station in Ohio where gasoline was obtained to set the truck on fire; and when they traveled

to Junior Furnace Powellsville Road where the truck with the victim's body inside of it was set

on fire.  In addition, Roman Brandau, a state fire investigator who recovered the items that were

deposited in Kentucky because Steinhauer showed him where they were located, testified that

Steinhauer directed him to drive "through [a] neighborhood, eventually into some farm fields, all

the way back to an area that set near the railroad tracks right by the river."  (*Id.*, Trial Tr. 210, at

PAGEID#: 570).  The cell phones, which were found in a "clearing area," were damaged.  (*Id.*,

Trial Tr. 210-11, at PAGEID#: 570-71).  They had been "struck with something . . . consistent

with . . . a hatchet," and the interior chips and components had been "forcibly removed" from

them.  (*Id.*, Trial Tr. 211-12, at PAGEID#: 571-72).  The hatchet was found in the woods,

"several feet off the roadway."  (*Id.*, Trial Tr. 214, at PAGEID#: 574).  A juror could reasonably

infer from such evidence that petitioner participated in the destruction of the victim's cell phones

and concealment of the hatchet, which had been used as a murder weapon, for the purpose of

impairing their availability as evidence in the ensuing criminal investigation.  In light of the

evidence of petitioner's involvement in the arson offense, a rational juror could infer that

petitioner also participated in the destruction of the truck containing the victim's body for the

purpose of impairing its availability as evidence.

Finally, enough evidence was presented to support the reasonable inference that

petitioner destroyed the clothing he wore during the commission of the crimes.  As the Ohio

Court of Appeals reasonably found, the presence of the burn pile on the property where

petitioner and Linkous resided and the fact that neither petitioner's nor Linkous's clothing were

recovered supports such an inference.  Indeed, although petitioner denied that he burned his

clothing in his police interview, he admitted that Linkous had done so.  (*See id.*, Trial Tr. 268,

271, at PAGEID#: 634, 637). Given that both Linkous and petitioner appeared like that had recently showered when they were first encountered by the police at petitioner's trailer on the night of the crimes, a reasonable juror could infer that both men acted together to burn their clothing on the burn pile with the purpose of impairing their availability as evidence before the police arrived at the property.

Accordingly, in sum, petitioner is not entitled to relief based on his claim in Ground Three of the petition challenging the weight and sufficiency of the evidence against him. Petitioner's weight-of-evidence claim is not cognizable in this federal habeas proceeding because it raises only an issue of state law, which this Court lacks jurisdiction to review. To the extent that petitioner has also asserted a sufficiency-of-evidence claim that is subject to review by this Court, upon review of the trial transcript, and under the double-layer deferential standard of review that must be applied in this proceeding, the undersigned concludes that the Ohio Court of Appeals' determination that sufficient evidence was presented at trial to support petitioner's convictions for aggravated murder, murder, aggravated arson, arson, kidnapping and tampering with evidence neither is contrary to nor involves an unreasonable application of the clearly-established applicable standard of review enunciated by the Supreme Court in *Jackson*.

### H. Petitioner Is Not Entitled To Habeas Relief Based On His Claim Of Cumulative Error Alleged In Ground Ten Of The Petition

Petitioner alleges in Ground Ten of the petition that the accumulation of errors, which occurred during his trial, deprived him of his constitutional right to a fair trial. (Doc. 1, at PAGEID#: 15). Petitioner is not entitled to relief based on such a claim.

As discussed above in addressing other claims that have been raised by petitioner as grounds for habeas relief, the federal habeas corpus remedy is available only to correct federal constitutional violations. *See* 28 U.S.C. § 2254(a); *see also Wilson v. Corcoran,* 562 U.S. 1, 5

(2010); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).  As the Sixth Circuit has made clear in numerous decisions, following the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996, "not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."  *See, e.g., Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012) (quoting *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010), in turn quoting *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).  As the Sixth Circuit explained in *Moore*, 425 F.3d at 256, habeas relief cannot be granted post-AEDPA on the basis of cumulative error because there is "no Supreme Court precedent obligating the state court to consider the alleged trial errors cumulatively."  *See also Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  Therefore, because none of petitioner's individual claims of trial error merit habeas relief, petitioner is unable to obtain relief based on the claim of cumulative error alleged in Ground Ten of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The petitioner's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2.  A certificate of appealability should issue for the following claims alleged in the petition, which were addressed on the merits herein:  (a) the claim in Ground Five challenging the admission of petitioner's videotaped police interview into evidence on the ground that it contained impermissible hearsay statements by petitioner's co-defendants in violation of the Confrontation Clause; and (b) the claim in Ground Six that petitioner's trial counsel was ineffective for failing to file a motion to suppress statements made by petitioner in his police interview after he invoked his right to counsel.

A certificate of appealability should not issue with respect to petitioner's remaining

grounds for relief that have been considered on the merits herein because petitioner has not stated a "viable claim of the denial of a constitutional right," nor are the issues presented in those remaining grounds "adequate to deserve encouragement to proceed further."  *See Slack v. McDaniel,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  In addition, to the extent that petitioner has raised claims in the petition which this Court has concluded are waived and thus procedurally barred from review in the petition, a certificate of appealability should not issue because, under the first of the applicable two-part standard enunciated in *Slack,* 529 U.S. at 484-85, "jurists of reason" would not find it debatable whether this Court is correct in its procedural rulings.[19]

    3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and, therefore, should **GRANT** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

 

s/Stephanie K. Bowman
Stephanie K. Bowman
United States Magistrate Judge

---

[19]Because the first prong of the *Slack* test has not been met, the Court need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in any of the defaulted claims for relief.  *See Slack,* 529 U.S. at 484.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DAVID KEITH GERALD,                                    Case No. 1:15-cv-493
      Petitioner,

                                   Dlott, J.
      vs.                                          Bowman, M.J.

WARDEN, ROSS
CORRECTIONAL INSTITUTION,
      Respondent.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

cbc